**NORTH TEXAS PRODUCERS ASSO-CIATION, Appellant,**

**v.**

**Keith YOUNG, Appellee.**

**No. 19146.**

United States Court of Appeals Fifth Circuit.

Sept. 13, 1962.

Rehearing Denied Oct. 17, 1962.

Ashton Phelps, New Orleans, La., William C. Odeneal, Jr., Odeneal & Odeneal, Dallas, Tex., Phelps, Dunbar, Marks Claverie & Sims, New Orleans, La. (Charles M. Lanier, New Orleans, La., of counsel), for appellant.

Waller M. Collie, Jr., Logan Ford, Burford, Ryburn & Ford, Dallas, Tex., for appellee.

Before RIVES, CAMERON and GEWIN, Circuit Judges.

GEWIN, Circuit Judge.

This is a suit for treble damages under the Sherman Anti-Trust Act, 15 U.S.C.A. § 1 et seq.[1] Keith Young, Plaintiff-Appellee, claims that North Texas Producers Association, Defendant-Appellant, conspired with one or more handlers and producers of milk in the Dallas-Fort Worth area to breach a certain contract with Young in violation of the Sherman

---

1. Sections 1 and 2 provide in substance that:

"§ 1. Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is [hereby] declared to be illegal: * * * Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a misdemeanor. * * *

"§ 2. Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor * * *."

Anti-Trust Act and resulting in damage to him (Young).[2]

The jury found in favor of Young and awarded damages in the amount of $100,000.00, which were trebled by the court, to which was added attorneys' fees and judgment with interest rendered accordingly. From this judgment North Texas has appealed, claiming substantially as follows: the complaint did not state a cause of action; there was no evidence of a violation of the Sherman Act; only the simple breach of a contract is involved; and the damages proved, if any, were speculative.

On July 13, 1956, Young and North Texas entered into a contract in Dallas, Texas, by the terms of which North Texas agreed to sell bottled milk to Young in one gallon glass containers. Young had been engaged in the business of milk production and distribution in Kansas City, Kansas, prior to 1956 when he came to Dallas. The contract provided that North Texas was to furnish Young's requirements of milk ready for distribution; and Young was to obtain the necessary permits to do business, including a permit to use a particular type label required in the area. The name of North Texas was not to be used on the label unless it consented. Actual performance of the contract was to commence when the necessary preparations were completed.

In November 1956, North Texas informed Young that it would not go through with the contract. According to Young, supported by a finding of the jury, the chief reason why North Texas refused to perform the contract was that the other milk handlers and distributors in the area objected to it; and had made an agreement with North Texas that they, the handlers and distributors, would pay North Texas an additional one cent per quart for milk for the refusal of North Texas to perform the agreement with Young. With one minor exception, the largest retail container of milk in the market area prior to the North Texas-Young contract was a half gallon paper carton which sold for approximately 50 cents. Accordingly, members of the public who wished to purchase a gallon of Class I milk in the area, were required to purchase two half gallon paper cartons at a cost of approximately 96 cents. If the contract between Young and North Texas had been performed, Young proposed to retail Class I milk in gallon jugs at 69 cents, or approximately 27 cents less than the prevailing price. After the contract was breached by North Texas, Young became part owner and general manager of Jere Dairy, Inc., and actually sold milk in Dallas at "the average out-of-store price to the consumer" at "just a shade over 69 cents".

Before the alleged arrangement was worked out between North Texas and the other milk handlers and distributors, North Texas had made preparations to fulfill its obligations under the contract with Young. North Texas had done some bottling on a small scale but prior to the contract with Young had not engaged extensively in processing and bottling milk. In making ready to perform the contract with Young, North Texas actually spent approximately $20,000.00 in the purchase of washers, fillers, separators, homogenizers, tanks, glass jugs, cases, caps and other necessary equipment and supplies.

2. The following is from the Court's jury charge:
"A conspiracy—and 'contract', 'combination' or 'conspiracy' mean essentially the same thing in this case—is an agreement between two or more persons shown either by words or by deeds. In this suit the plaintiff alleges that North Texas Producers Association conspired with one or more of seventeen handlers and distributors of milk in the Dallas-Ft. Worth area, namely, Bluff View Farms, The Borden Company, Boswell Dairies, Brooks Dairy, Inc., Cabell's Inc., Foremost Dairies Inc., Lucerne Milk Company, Lyles Dairy, Metzger Dairies, Oak Farms Dairy Products, Schepps Dairy, Stripling Dairy, Marigold Milk Company, Foremost Dairies, Triangle Dairy, Vandervoort's Dairy, Inc. and Golden Gate Dairy."

At the time of the execution of the North Texas-Young contract, there were approximately 18 distributors of Class I milk in the Dallas-Fort Worth marketing area. North Texas furnished approximately 85% of the milk handled by such distributors. There was only one small company at that time which was engaged in the business of selling Class I milk in gallon glass containers, which amounted to approximately one-half of one percent of the business in the market area. To a very substantial degree, the consuming public was dependent upon the distributors and milk handlers mentioned for a supply of Class I milk.

For some time prior to the breach of the North Texas-Young contract, North Texas had been endeavoring to induce the distributors and milk handlers to pay it a premium for Class I milk over the federally regulated minimum price. When it became known that the distributors were anxious to upset the North Texas-Young arrangement an agreement was reached between North Texas and the handlers and distributors whereby North Texas would refuse to perform the contract with Young and the distributors would increase their price to North Texas by the sum of 40 cents per hundred weight—at least the jury so found and there was evidence to that effect. Although it is stoutly argued that there is no causal connection between the breach of the Young contract and the increase in price to North Texas, both events occurred in close proximity of time. The result of this increase of 40 cents per hundred weight to North Texas, which is approximately one cent per quart, was to raise the wholesale price of milk in Texas wherever federal marketing orders were in effect, namely, Dallas, Fort Worth, Wichita Falls, Amarillo and certain other Texas cities. The effect on the retail price to the consuming public in the Dallas-Fort Worth area was an advance of one cent per quart. There was evidence to the effect that the increase was worth approximately one and a half million dollars to North Texas over the four months period of the price increase.

On December 2, 1958, Young filed the instant suit in the United States District Court alleging that North Texas had conspired with certain named distributors and individuals to refuse to sell him processed Class I milk bottled in one gallon glass containers, and upon trial the jury found this allegation to be true. The thrust of the argument of North Texas on this appeal is not aimed at the existence vel non of a conspiracy, but strongly asserts that Young did not state a cause of action under the antitrust laws and suggests an action for simple breach of contract.

The distinguished trial judge clearly and fairly instructed the jury on the issues involved; and several special issues were submitted to the jury. No errors are specified with respect to the instructions given to the jury by the court or with respect to the refusal or the giving of any special instructions. In effect, the jury found that on November 2, 1956, Young had the intention and was prepared to enter the milk business in the Dallas-Fort Worth area pursuant to the mentioned contract, and on that date North Texas entered into a contract, combination or conspiracy with one or more of the handlers and distributors of milk in that area whereby it was agreed that if such handlers and distributors would voluntarily pay the price increase for milk they were to purchase from North Texas from November 5, 1956 to February 28, 1957, North Texas would refuse to sell Class I bottled milk in one gallon glass containers to Keith Young; that the arrangement between North Texas and such milk handlers and distributors operated as a restraint of trade or commerce among the several states as such term had been explained in the court's charge; and assessed the damage suffered by Young to the date the trial began on February 20, 1961, as the result of the conspiracy, at the sum of $100,000.00.

North Texas' motion for judgment N.O.V. was overruled and its alternative

motion for a new trial was overruled. The court concluded that the jury's verdict was amply supported by the evidence; that the plaintiff was entitled to judgment on the verdict and that the damages found by the jury should be trebled. After taking testimony, the court fixed as reasonable attorneys' fees for Young's counsel the sum of $20,000.-00 for services rendered in the District Court.

The Sherman Anti-Trust Act was characterized by Chief Justice Hughes in Appalachian Coals, Inc. v. United States, 288 U.S. 344, 359–360, 53 S.Ct. 471, 474, 77 L.Ed. 825 (1933), "as a charter of freedom * * * has a generality and adaptability comparable to that found to be desirable in constitutional provisions. * * * The restrictions the Act imposes are not mechanical or artificial. Its general phrases, interpreted to attain its fundamental objects, set up the essential standard of reasonableness." That case and many others since have held that the Sherman Anti-Trust Act should not be required to operate in a straitjacket or be interpreted in a narrow, technical sense.

A background of fundamentals in this field of law was established by Mr. Chief Justice White in Standard Oil Co. of N. J. v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911). In explaining the history of the Sherman Act and commenting extensively on the common law as it existed before the act was adopted, the court had much to say about the vast accumulation of wealth and power in the hands of corporations and individuals, the enormous development of business enterprises, the facility for combination and the widespread impression to the effect that, " * * * their power had been and would be exerted to oppress individuals and injure the public generally." The opinion asserts that "restraint of trade" and "monopolization" had their beginnings before the adoption of the act, but are not confined to a narrow conception of the common law. Even the early common law and English Statutes condemned monopolistic power to fix prices to the injury of the public, to impose limitations on production, and recognized the danger of deterioration in quality which is said to result inevitably from a monopolistic control of production and sale. These background factors and other considerations the court stated, " * * * led, as a matter of public policy, to the prohibition or treating as illegal all contracts or acts which were unreasonably restrictive of competitive conditions".

Important to consider, according to that decision, are the nature or character of the contract or the act, and the "surrounding circumstances" which may support an inference or presumption that they tended " * * * to bring about the evils, such as enhancement of prices, which were considered to be against public policy." The act is to be viewed from a practical common sense point of view and the results of the conditions or the acts involved are to be carefully examined. Section 1 is characterized as " * * * an all-embracing enumeration to make sure that no form of contract or combination by which undue restraint" was accomplished or achieved could save it from the condemnation of the act. It was to reach all "undue restraint". The rule to guide courts in deciding whether or not there has been a violation is " * * * the standard of reason which had been applied at the common law and in this country in dealing with subjects of the character embraced by the statute". In a particular case therefore, such was to be the yard-stick or guide rule to determine whether a particular act had or had not violated the statute. Section 2 was interpreted as a supplement to Section 1 " * * * to make sure that by no possible guise could the public policy embodied in the first section be frustrated or evaded. * * * "

In the same year, the Chief Justice in United States v. American Tobacco Company, 221 U.S. 106, 31 S.Ct. 632, 55 L.Ed. 663, concluded that American had violated both Sections 1 and 2 of the act, " * * * not alone because of the dominion and control over the tobacco

trade which actually exists, but because we think the conclusion of wrongful purpose and illegal combination is overwhelmingly established."

Standard Oil and American Tobacco, with other cases, have certainly established the following general principles:

1. The Sherman Anti-Trust Act prohibits all " * * * contracts or acts which it was considered had a monopolistic tendency, especially those which were thought to unduly diminish competition * * *" and acts " * * * producing or tending to produce the consequences of monopolies". If there is restraint of trade and monopoly, competition—by whatever means is unduly limited.

2. The Rule of Construction is the Rule of Reason, which requires an interpretation in the light of broad public policy favoring competition and condemning monopoly. The courts are to decide whether conduct is significantly or reasonably anticompetitive in character or effect.

3. Certain types of conduct such as agreements among competitors to fix market prices or control production are " * * * conclusively presumed to be illegal, by reason of their nature or necessary effect * * *" and must be adjudged violations of the act.

4. Evidence regarding market position, power of the alleged monopolizers, business practices and the specific purpose to monopolize is to be considered, as well as prior deliberate acts seeking monopoly position, " * * * frequently manifested by acts and dealing wholly inconsistent with the single conception of advancing the development of business power by the usual methods".

As to monopolization through combination, the court said in American Tobacco v. United States, 328 U.S. 781, at 809, 66 S.Ct. 1125, at 1138–1139, 90 L. Ed. 1575 (1946):

" * * * A correct interpretation of the statute and of the authorities makes it the crime of monopoliz-

ing, under § 2 of the Sherman Act, for parties, as in these cases, to combine or conspire to acquire or maintain the power to exclude competitors from any part of the trade or commerce among the several states or with foreign nations, provided they also have such a power that they are able, as a group, to exclude actual or potential competition from the field and provided that they have the intent and purpose to exercise that power. * * *"

In commenting upon monopoly power achieved through combination or *conspiracy*, the court in American Tobacco quoted with approval the following language from Judge Hand's opinion in the Alcoa case:[3]

" * * * It does not follow because 'Alcoa' had such a monopoly, that it 'monopolized' the ingot market: it may not have achieved monopoly; monopoly may have been thrust upon it. If it had been a combination of existing smelters which united the whole industry and controlled the production of all aluminum ingot, it would certainly have 'monopolized' the market. In several decisions the Supreme Court has decreed the dissolution of such combinations, although they had engaged in no unlawful trade practices. * * * We may start therefore with the premise that to have combined ninety per cent of the producers of ingot would have been to 'monopolize' the ingot market; * * *."

Thus it follows that if monopoly power has been achieved through combination or conspiracy, Section 2 has been violated without further proof. "Intent and purpose to exercise that power" is established by proof of the fact of combination or conspiracy. As a practical matter, it is foolish to combine or conspire without an intent to make use of the power resulting therefrom. To hold otherwise would be ridiculous, naive and impractical.

3. United States v. Aluminum Company of America, 148 F.2d 416, 429, (2 Cir., 1945).

Violations of the act have been manifested in numerous ways as illustrated by the following cases: The act of a group of motion picture distributors who, together, have a monopoly in the distribution of pictures, who combined and conspired to refuse to furnish films to a particular exhibitor, to cause a breach of contracts with him and to prevent him from carrying on his business, Binderup v. Pathe Exchange, Inc., 263 U.S. 291, 44 S.Ct. 96, 68 L.Ed. 308; a conspiracy of competing appliance retailers and manufacturers and distributors of appliances who agreed not to sell appliances to the plaintiff, Klor's, or to sell only at discriminatory prices or on unfavorable terms, even though there were opportunities to buy in a competitive market, Klor's, Inc. v. Broadway-Hale Stores, Inc., Admiral Corp., et al., 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741; the exclusion by a board of trade having monopolistic power, of an owner of a warehouse from a tobacco market, American Federation of Tobacco Growers, Inc. v. Neal, (4 Cir., 1950) 183 F.2d 869; exclusion of a competitor from a building and an appropriate market for business opportunities without justifiable business reasons, Gamco, Inc. v. Providence Fruit & Produce Building, Inc., (1 Cir., 1952) 194 F.2d 484; an agreement of brewers of beer not to sell to a particular person or class of persons, Johnson v. Schlitz (D.C. E.D.Tenn., 1940) 33 F.Supp. 176; agreement among competitors to fix minimum resale prices of their products, Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, (1951) 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219. There are many other cases which present a myriad of situations demonstrating ingenuity, disguise, intrigue and subterfuge to avoid the appearance of law violation.

Many antitrust cases are tedious, involve a number of individuals or corporations, with claims and counter-claims, and usually with conflicting facts. This case is no exception. Counsel, commendably, have filed briefs, supplemental briefs, reply briefs and second reply briefs. Counsel for North Texas, both in oral argument and in supplemental reply brief, lay great emphasis on the assertion that Young was entitled only to that degree of fair and equal treatment owed by North Texas, the alleged monopolist, to the general public. While the announced principle may be true, it is translated by counsel for North Texas to mean that Young was seeking some special privilege or advantage *not available* to his competitors; and thus it is claimed, Young was not seeking equal treatment.[4] In addition, in its second reply brief, North Texas lays great emphasis on the case of Duff v. Kansas City Star Co., 299 F.2d 320 (8 Cir., 1962). The Duff case is cited for the proposition that unless a person is "injured in his business or property", he has no cause of action under the Clayton Act, 15 U.S.C.A. § 12 et seq.

We cannot accept the arguments advanced by North Texas and will deal with them in the order stated. Factually, it is difficult to conceive how it may be logically argued that Young was seeking some special privilege or advantage *not available* to his competitors. It is not a special privilege or advantage to enter into the type of contract executed by Young and North Texas. To make a contract may be a privilege and certainly, the parties to it hope it will be advantageous, but we see nothing "special" involved here. Further, no valid reason has been given to indicate that the same privilege or advantage was not available to other handlers and distributors of milk. From aught that appears, they did not desire such a contract; or if so, no effort was made to obtain one. North

---

4. * "We respectfully submit, as pointed out during oral argument, that each one of these cases involved a denial to the plaintiff of that degree of fair and equal treatment owed by the defendant alleged monopolist to the general public. In none of these cases was plaintiff seeking some special privilege or advantage not available to his competitors; rather, he was seeking equal treatment."

* From Supplemental Reply Brief of Appellant.

Texas claims that because it had engaged in the business of processing and bottling milk on a very minimum scale; and since the production and services rendered to other handlers and distributors was somewhat different from that agreed to be furnished to Young, the contract resulted in a special privilege or advantage to Young.

Actually, other handlers and distributors of milk were selling gallons of milk to the public, if the public desired to buy two half gallons and pay a much greater price. Young proposed to sell a single gallon container of milk at a price approximately 27 cents below the price being charged by other handlers and distributors for two half gallons. It is difficult for us to believe that the business of placing milk in a single gallon container with the processing incident thereto is a special privilege or advantage not available to Young's competitors in the market. The mere fact that they had never undertaken such an operation, had not requested North Texas to render the same service agreed to be furnished to Young, does not establish the existence of a "special privilege or advantage not available to his [Young's] competitors". We cannot square the position of North Texas with the following holding in Gamco, Inc. v. Providence Fruit & Produce Bldg., Inc., supra, 194 F.2d 484:

"The Act does not merely guarantee the right to create markets; it also insures the right of entry to old ones. See United States v. New England Fish Exchange, D.C. Mass., 258 F. 732; United States v. Tarpon Springs Sponge Exchange, 5 Cir., 142 F.2d 125.

"Thus in American Federation of Tobacco Growers v. Neal, 4 Cir., 183 F.2d 869, 872, defendant trade association, which regulated and administered tobacco warehouse sales in the Danville, Virginia, area, denied plaintiff co-operative access to the local auctions. Plaintiff tried to proceed independently, but failed to attract buyers enough to make his own auctions a success. Holding that the exclusion of competing warehousemen constituted a violation of the Sherman Anti-Trust Act, the court said, ' * * * having set up the market in this way, defendants may not be heard to say that they have not established a monopoly merely because they do not interfere with an outside warehouse if it can shift for itself.' To the same effect is United States v. Terminal Railroad Ass'n of St. Louis, 224 U.S. 383, 32 S.Ct. 507, 56 L.Ed. 810, holding illegal the control of existing approaches to St. Louis by less than all competing railroads. * * *

"The conjunction of power and motive to exclude with an exclusion not immediately and patently justified by reasonable business requirements establishes a prima facie case of the purpose to monopolize."

To the same effect is Vines v. General Outdoor Advertising Co., 171 F.2d 487:

"The Anti-Trust Acts give a right of action to 'any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws'; and it has been repeatedly held that those are within this language who have been so injured though they have no contract with the wrongdoer, but only an expectation of future dealings with him."

In Delaware Valley Mar. Sup. Co. v. American Tobacco Co., (D.C.E.D.Pa. 1960) 184 F.Supp. 440, the identical argument as made by North Texas here was made there. We agree with the holding of the court in that case:

"Section 4 of the Clayton Act authorizes the recovery of treble damages by any person who is injured in his 'business' or 'property' by reason of anything forbidden by the anti-trust laws. Defendants contend that since plaintiff never actually engaged in business, it had no business within the intendment of Section 4. Defendant's argument

necessarily presupposes that when Congress authorized treble damage suits it meant to distinguish between the rights of persons who are put out of business and the rights of persons who are kept out of business by a conspiracy. It is unreasonable to suppose that such a distinction was intended by Congress. The purpose of the anti-trust laws is to promote competition and to prevent its restraint. This purpose is no less thwarted when a person who intends and is prepared to embark in trade is stopped at the outset, than it is when a going business is brought to a standstill. It is as unlawful to prevent a person from engaging in business as it is to drive him out of business. Thomsen v. Union Castle Mail S. S. Co., 2 Cir., 1908, 166 F. 251, 253. The restriction which defendants would place upon the meaning of the word 'business' is unwarranted in the context of its Clayton Act usage."

The above statement is amply supported by other well reasoned decisions: Triangle Conduit and Cable Co., Inc. v. National Electric Prod. Corp., (3 Cir., 1945) 152 F.2d 398; Goldman Theatres v. Loew's, Inc., (D.C.E.D.Pa., 1946) 69 F. Supp. 103, Aff. 3 Cir. (1948) 164 F.2d 1021.

As stated by North Texas in its second reply brief, "The Duff decision stands for the proposition that unless a person is 'injured in his business or property,' he has no cause of action under the Clayton Act." We see no conflict in the holding of the Duff case with the decision reached here. First, the Duff case presents facts entirely different from those under consideration here. Indeed, the trial court likened the plaintiff in Duff to a stranger who might enter Kansas City "with the desire or wish" to enter the newspaper publishing field; which is to say, that the "desire or wish" is all the stranger had. No property was involved. In effect, the court held that there was no established business (good will) to which the name or

trademark there involved attached and then stated: "If none exists, then there is no property right in the name." The court anchored its opinion to former holdings of the Eighth Circuit:

"* * * [It is settled] in this circuit that there is no such thing as property in a trade-mark except as a right appurtenant to an established business or trade with which the mark is employed * * *"

In addition to holding that after 8 years of non-publication, the plaintiff possessed "neither business nor property, including good will, which could have been damaged by appellees' monopoly within the period of limitation", the concluding statement in the opinion is a quotation from the opinion of the trial court holding that the plaintiff's action was barred by the statute of limitations.

■■ Keith Young was guilty of no lethargy or speculative assertion of a mere wish, desire or intention to engage in business. In July he bound himself by the terms of a contract, which the evidence indicates would have been in performance in December. The alleged conspiracy stopped him cold in November. It is our opinion that Young was "injured in his business or property". A valid contract is property. Miller et als. v. Howe Sound Min. Co., (D.C.E.D. Wash.) 77 F.Supp. 540; Deutsche Bank, etc. v. Cummings, (C.C.A.D.C.1936) 83 F.2d 554; Lynch v. United States (1934) 292 U.S. 571, 54 S.Ct. 840, 78 L.Ed. 1434. The last cited cases, from courts of all levels, conclusively hold that valid contracts are "property".

■ North Texas seriously objects to the method of proving damages. In one phase of his proof, Young showed that the nearest market to him was Kansas City. He then proved that the "Kansas City cost" for the year 1958 was 60.6 cents per gallon as contrasted with 49.2 cents per gallon as provided in the contract, or a difference of 11.4 cents unit cost. Another method used by the plaintiff is referred to as "cost on actual

sales". The sales used were the actual sales of Jere Dairy, Inc. which Young partially owned and actually operated after the breach of the North Texas contract, and which sold milk in gallon glass containers in the Dallas-Fort Worth area. Young offered evidence of what the actual cost per gallon would have been under the breached contract; what his distribution cost per gallon would have been using average figures for the years involved over the period in question based on Jere Dairy's actual distribution cost experience; and the prices at which gallon containers of milk actually sold over the period in question. North Texas claims that a better method of proof should have been followed, that the proof offered was vague, indefinite and inaccurate and the damages shown are speculative.

In connection with the question of proof of damages, we believe it to be helpful to set forth in the margin the instructions of the court to the jury with respect to which no error is specified.[5]

It is settled law that the courts tend to find some way in which damages can be proved and awarded where a wrong has been committed. Difficulty in ascertaining the amount of damages is

5. "Our law permits the jury to take into account both any damages which may have been inflicted on existing property, and the damages which may have been sustained as a result of being unable to make profits which reasonably could have been anticipated and would have been realized if it were not for the violation of the antitrust laws, if any such violation occurred. But you are instructed that it must first be determined that any conspiracy which may or may not have existed was a substantial cause to the damage to the plaintiff. In a violation of the antitrust laws, in order for the plaintiff to recover, he must prove that the violation was an identifiable substantial cause of the damage which he sustained. The plaintiff then must satisfy you that the damage, if any, which he suffered was as a fact attributable to the conspiracy, if any there existed. But while the plain-(sic) he may have sustained was the result of the conspiracy, he would not have to prove with exact mechanical accuracy the extent of the damage.

"In considering the element of future profits in determining what damages, if any, were sustained by plaintiff you are instructed that if because of the conspiracy the plaintiff was unable to earn net profits which would have accrued to it, but for the conspiracy, then plaintiff was in fact damaged. Future profits mean net profits and are determined by subtracting the costs and expenses of a business from its gross revenue. The fact that a plaintiff's business may have been new or unestablished is not fatal to the element of damages constituting net profits. You are instructed that you may consider in determining whether or not any part of plaintiff's damages consti-

tute future net profits the uncertainty which makes the success of a new business problematical, the experience of the plaintiff in the milk business, the competition which the plaintiff would have had in the Dallas-Ft. Worth area, and the general market conditions in such area. And you may also take into consideration as a reduction of any damages for loss of future profits which you may find, any net profits which Keith Young made in the milk business subsequent to 1956. You may not base any finding of damage on sheer guesswork but must make a just and reasonable estimate of the damage based on the relevant evidence.

"Under the antitrust laws if the plaintiff ultimately prevails, the judgment which he would be awarded would be three times the amount of damages which the jury finds, but you are instructed that you are only to calculate damages, if any, upon the basis of single, and not treble, damages; the trebling of the amount of damages is not part of the jury's function and is solely a matter for the Court. Likewise, you are not to take into account any problem with respect to counsel's fees. If counsel's fees are to be awarded, that is the Court's function. You are also not to take into consideration any interest on any damages which you may find, since where treble damages are available, interest is not appropriately allowed.

"The burden of proof in this case is upon the plaintiff and that means he must sustain any right to a recovery herein by a preponderance of the evidence admitted during the trial. By the term 'preponderance of the evidence', as used in this charge, is meant the greater weight or degree of credible evidence in the case." (Tr. Vol. II, pp. 693–4)

not to be confused with the right of recovery. When wrongdoers, by their very actions, make it virtually impossible to prove damages precisely, they should not be heard to complain of the method of proof, if the method allowed by the trial court is reasonable under the facts and in the circumstances of the case. To hold otherwise would permit one to profit by his own wrong and to violate the law and avoid the penalty. Thus, in antitrust cases, comparison of receipts before and after the alleged unlawful action, though not precisely accurate, is considered valid proof. Bigelow v. R.K.O. Radio Pictures, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1946). The wrong done to Young was a tort and the wrong itself was of such a nature as to render it virtually impossible to prove the amount of damages with positive certainty and precision. As held in Story Parchment Co. v. Patterson P. Paper Co., 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931), " * * * it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts." It is sufficient "if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only proximate". This principle is announced by numerous decisions, of which we cite only a few; Goldman Theatres, Inc. v. Loew's, Inc. (D.C.E.D.Pa., 1946) 69 F.Supp. 103, aff. (C.C.A.3, 1948) 164 F.2d 1021; Eastman Kodak Co. of New York v. Southern Photo Materials Co., 273 U.S. 359, 47 S. Ct. 400, 71 L.Ed. 684 (1927). In the instant case, we hold that Young proved his damages in about as precise a manner as the wrong committed by North Texas allowed. The objection of North Texas is not a valid one in view of its own wrongdoing.

■ Other arguments are made by North Texas claiming that proof of damages should be limited to four months, the period during which it received a price increase; or six months because the contract could be terminated on six months' notice. These contentions are rejected.

■ North Texas further claims that the contract was impossible of performance because the consent of North Texas to the use of a certain label was required under the contract, and that such consent was not given. There is sufficient evidence in the record to dispose of this rather frivolous contention; but in addition, it is appropriate to say that since the action here involved is one of tort for an unlawful conspiracy in violation of the antitrust laws, this insistence on a technical provision of the contract is without merit. In view of the conspiracy found, we doubt that there was much justification to hope that consent would be given. Steiner v. Twentieth Century Fox Film Corp., (9 Cir., 1956) 232 F.2d 190.

■ There is some intimation in the briefs that interstate commerce is not involved.[6] It was stipulated by the parties that North Texas purchased milk across state lines which was mixed with the milk of Texas producers and the jury found in the affirmative on this issue. In our judgment, there was sufficient evidence to establish the fact that interstate commerce was involved.

■ In summary we hold that this case was tried in a fair and just manner by the distinguished trial court and we

---

6. The following is from the appellant's initial brief:

"We do not propose to urge at length but merely mention that the instant alleged violation did not affect Interstate Commerce. While there was much evidence to the effect that defendant was engaged in Interstate Commerce in that it acquired some raw milk from outside the State of Texas, nevertheless, we must again bear in mind that we are concerned solely with a contract to deliver bottled milk in a limited area. This point was urged below unsuccessfully and will not be reurged here at any length, but is asserted for the preservation of defendant's rights, although other points urged herein have been given greater prominence."

agree with the trial court that the facts decided by the jury are amply supported by substantial evidence. Under the applicable rules, there is no justification to disturb the facts found and further, we are persuaded that the conclusions reached by the jury are just and proper. The record in this case clearly demonstrates that there has been a violation of the federal antitrust laws in a positive, direct and flagrant manner. By combination and conspiracy, the milk handlers and distributors together with North Texas combined to stop Keith Young from entering the milk business in the market area involved and they accomplished what they set out to do. Their conduct was restraint of trade and they did monopolize. The public was injured in a real and vital sense because the price of milk was maintained at the level which the conspirators decided to maintain it. Competition was stifled and eliminated. North Texas gained its reward for its action by receiving an increase in the price it was receiving for the product it sold. Keith Young was damaged because he lost a contract—destroyed by combination and conspiracy; and he lost the opportunity to proceed with the contract according to its terms. The competition he could have provided with the prices and gallon containers which North Texas agreed to supply was eliminated.

 Young has filed an application for attorneys' fees for services rendered by his counsel on this appeal. We have given consideration to the testimony in the record with respect to the fees fixed by the trial judge for services in the trial court and have considered the services rendered by Young's counsel in this court. For the services of Young's attorneys in this court in handling this appeal, we find and determine that $5,-000.00 is reasonable and said sum is hereby fixed and determined to be reasonable and shall be included and taxed as part of the costs in this Court.

The judgment is

Affirmed.