**INDUSTRIAL INVESTMENT DEVELOP-MENT CORPORATION, Indonesia Industrial Investment Corporation, Ltd., and Forest Products Corporation, Ltd., Plaintiffs-Appellants,**

v.

**MITSUI & CO., LTD. and Mitsui & Co. (U.S.A.), Inc., Defendants-Appellees.**

No. 78–1775.

United States Court of Appeals, Fifth Circuit.

April 25, 1979.

Rehearing and Rehearing En Banc Denied July 6, 1979.

Fitzhugh H. Pannill, Jr., R. Hayden Burns, Houston, Tex., for plaintiffs-appellants.

Fulbright & Jaworski, Rufus Wallingford, B. J. Bradshaw, Jerry E. Smith, Houston, Tex., for defendants-appellees.

Before JONES, CLARK and INGRAHAM, Circuit Judges.

CHARLES CLARK, Circuit Judge:

The sole issue in this appeal is whether the act of state doctrine precludes a trial of plaintiffs' antitrust action.[1] Plaintiffs claim damages from Mitsui & Co., Ltd., a Japanese corporation, and its American subsidiary, Mitsui & Co. (U.S.A.), Inc., for violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C.A. §§ 1 & 2, and Section 73 of the Wilson Tariff Act, 15 U.S.C.A. § 8. The complaint appended state law claims of tortious interference with contractual relations against these defendants and a breach of contract charge against the Indonesian defendant, P. T. Telaga Mas Kalimantan Co. Following extensive discovery, the district court granted defendants' motion for summary judgment. Defendants urged their motion on five grounds: (1) plaintiffs lack standing since they have incurred only derivative damage as shareholders; (2) the extraterritorial reach of American antitrust laws cannot grasp this case; (3) plaintiffs are not within the "target area" of antitrust law protection; (4) forum non conveniens; (5) act of state doctrine. The district court's decision was based solely on the ground that the act of state doctrine prevented judicial review of the federal claims.[2] Because of its ruling on the federal claims, the district court exercised its discretion to dismiss the pendent state claims.[3]

The district court's invocation of the act of state doctrine in this case was in error. Although the regulations of a foreign state, Indonesia, formed part of the background to the activities alleged, neither the validity of those regulations nor the legality of the behavior of the Indonesian government is in question here. The mere fact that members of the Indonesian government were to play a part in the alleged scheme does not insulate defendants' accountability for conduct which might prove to be prohibited by our antitrust laws.

The present dispute evolves from plaintiffs' desire to enter the logging and lumber products business in East Kalimantan (Borneo), Indonesia. Late in the 1960's, the government of Indonesia began developing a plan for encouraging and regulating foreign private capital investment. The consequent Foreign Capital Investment Act provided for restrictions of private investment in certain fields, required the development of Indonesian manpower, and required opportunities for Indonesian co-ownership. Thus a foreign company could not conduct business within that country until it joined with a local company, and they together organized an independent limited liability company under Indonesian law. Known as P.T.'s (Perseroan Terbatas), these companies, which are closely analogous to American corporations, must have their organization approved by the government before they become effective.

Land use is also subject to regulation under the Act. A properly organized P.T. cannot harvest timber from the state-controlled land until it has been granted a concession and cutting license by the Department of Forestry pursuant to an application for forestry exploitation rights. The procedure contemplates preliminary surveys and negotiations between the applicant and the Director General of Forestry resulting in tentative concession rights embodied in a Forestry Agreement. The Agreement, accompanied by an Application Letter drafted by the P.T., is then to be submitted to the Minister of Agriculture within one month. Delay in submitting the Application Letter is considered grounds for revoking the Forestry Agreement. The Agreement and Letter must be channeled through the Depart-

1. The named plaintiffs in this action are Industrial Investment Development Corporation (an American Corporation) and its two Hong Kong corporate subsidiaries, Indonesia Industrial Investment Corporation, Ltd., and Forest Products Corporation, Ltd. They are collectively referred to as Industrial Investment or plaintiffs throughout this opinion.

2. We express no opinion on the merits of assertions (1)–(4).

3. Plaintiffs argue that independent diversity jurisdiction exists for the state claims. Because we find the federal claims justiciable, we need not resolve the dispute over the proper interpretation of the federal diversity statute, 28 U.S.C.A. § 1332.

ment. Following approval and payment of a concession fee, the Director General of Forestry issues a formal concession decree and a license which establishes the new company and authorizes its logging operations, subject to revocation for failure to carry out its obligations under the Forestry Agreement. Harvesting cannot begin until the license has been issued.[4]

In 1970 Industrial Investment [5] signed a joint venture agreement with Telaga Mas to harvest logs from a timber concession which had been granted to Telaga Mas in a government forest in Borneo. Under the agreement, Industrial Investment was to provide equipment, capital requirements and management, and supervisory and technical personnel. In exchange, Telaga Mas expressly agreed to cooperate in obtaining the necessary approvals for establishing the P.T. and securing the formal concession decree and cutting license.

Throughout the first six months of 1971 plaintiffs and Telaga Mas jointly negotiated with the Indonesian government for its approval of the proposed business. As a result, a Forestry Agreement was signed by the two companies and the Director General of Forestry on July 1, 1971. The Agreement set forth the capital, organization, and administrative requirements to be completed by the two firms before payment of the concession fee to the government and issuance of the cutting license to the newly formed P.T. The Agreement also contained provisions relating to the operation of the joint concession. More importantly, it reserved to the Department of Forestry the right to cancel for failure of the joint venture partners to cooperate or carry out their duties, and provided that cancellation of the joint venture agreement prior to the issuance of the license certificate would automatically terminate any rights of the parties to conduct lumbering operations. No license ever issued.

The district court refused to consider plaintiffs' allegations of a Sherman Act conspiracy since in its opinion the absence of an authorizing license governed the disposition of the case. Plaintiffs allege that the Mitsui defendants infiltrated and usurped control of the Telaga Mas management for the purpose of destroying plaintiffs' interest in the proposed logging concession. The complaint intricately details a plot, spawned from a 1972 increase in the price of timber, in which the Mitsui companies, past purchasers and creditors of Telaga Mas, decided first to eliminate Industrial Investment and then to protect its competitive edge by secretly taking direct supervision and control of the Telaga Mas operations for its own profit. Implementation of the scheme began when a shareholder group led by Harianto, a Telaga Mas official who was secretly backed by Mitsui, challenged the authority of Telaga Mas official, Sadjarwo, to execute the Forestry Agreement on behalf of Telaga Mas. Separate competing shareholder meetings were held by Harianto and Sadjarwo, each affirming the corporate authority of the leader of its respective faction. Eventually an Indonesian court declared Harianto's group to be properly in power and nullified the joint venture agreement.

When the news reached the Director General of Forestry, he sent a letter to plaintiffs and to Telaga Mas in which he "cancelled and affirmed invalid" the Forestry Agreement. In the same letter, he invited plaintiffs and Telaga Mas under its newly declared leadership to execute a new agreement. The cancellation, plaintiffs argue, was the natural operation of the Agreement's automatic termination provisions.

In a separate action, a second Indonesian court subsequently held that Industrial Investment was not bound by the nullification order since it was not a party to that action. Harianto continued to rule Telaga Mas, however, and refused to honor or participate in the joint venture with plaintiff.

---

4. *See generally*, Republic of Indonesia, *Invest in Indonesia* (January 1972).

5. Forest Products Corporation of Delaware, a predecessor company of Industrial Investment,

conducted the initial negotiations. For clarity we refer to the American company as Industrial Investment throughout.

Industrial Investment contends that defendants' poisoning of the joint venture caused the cancellation of the Forestry Agreement which in turn caused the government to deny the concession. The district court found that the act of state doctrine prohibited such a "two-step inquiry." It concluded: "Once it is established that the harm complained of was ultimately caused by a governmental act, the motivation behind the act, no matter how unscrupulous, is beyond judicial review."

The act of state doctrine has arisen as a means of determining the appropriateness of adjudicating in a United States court a dispute which in some manner involves a foreign government. As classically stated:

> Every sovereign state is bound to respect the independence of every other sovereign state, and the courts of one country will not sit in judgment on the acts of the government of another, done within its own territory.

*Underhill v. Hernandez*, 168 U.S. 250, 18 S.Ct. 83, 42 L.Ed. 456 (1897).

Early application of this doctrine was often muddled with the doctrine of sovereign immunity or principles of conflicts of law.[6] Since *Banco National de Cuba v. Sabbatino*, 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964), however, the doctrine has emerged as independently based on concerns of sepa-

ration of powers. The *Sabbatino* Court, cautious of judicial interference in executive affairs, refused to adjudicate the validity of expropriation by the Cuban government of property within its own territory owned by American nationals.[7] Its decision was based on several factors which pointed to the executive branch as the more appropriate tribunal to deal with the sensitive political issues. All related to the possible adverse consequences of an American court attempting to resolve the validity of title to property not within its jurisdiction or to judge a foreign state's power to expropriate the property of aliens. Of significance is the Court's express refusal to lay down "an inflexible and all-encompassing rule" of judicial abstention in every case not totally isolated to this country. 376 U.S. at 428, 84 S.Ct. at 940. Instead, it declared a less brittle doctrine, one with the "capacity to reflect the proper distribution of functions between the judicial and political branches of the Government on matters bearing upon foreign affairs." 376 U.S. at 427–28, 84 S.Ct. at 940. Relying on traditional political question reasoning, it found that the doctrine was not constitutionally compelled but that it rested on "'constitutional' underpinnings. It arises out of the basic relationships between branches of government in a system of separation of powers." 376 U.S. at 423, 84 S.Ct. at 938.[8] *Sabbatino's*

6. In *Underhill*, for instance, the defendant Hernandez was acting as an agent for the sovereign in which the alleged torts occurred. Thus the result could be said to rest on the personal immunity of foreign sovereigns. *Note*, The Act of State Doctrine: Antitrust Conspiracies to Induce Foreign Sovereign Acts, 10 Int'l Law and Politics 495 (1978). *See Oetjen v. Central Leather Co.*, 246 U.S. 297, 38 S.Ct. 309, 62 L.Ed. 726 (1918); *American Banana Co. v. United Fruit Co.*, 213 U.S. 347, 29 S.Ct. 511, 53 L.Ed. 826 (1909). *See also, Alfred Dunhill of London v. Republic of Cuba*, 425 U.S. 682, 705 n. 18, 96 S.Ct. 1854, 1866–67 n. 18, 48 L.Ed.2d 301 (1976). There is some authority that the doctrine still reflects conflicts of laws principles. This position assumes the validity of a foreign state's acts under the laws of that state. Applying the foreign laws to those acts, therefore, precludes an inquiry by American courts into their validity. *See* Note, Sherman Act Jurisdiction and the Acts of Foreign Sovereigns, 77 Colum.L.Rev. 1247 (1977).

7. Although *Sabbatino's* bar against claims based on the asserted invalidity of Cuban confiscations has been legislatively overruled by the "Hickenlooper Amendment," Foreign Assistance Act § 301(d)(4), 22 U.S.C.A. § 2370(e)(2) (1970), the case is still the leading authority on the act of state doctrine.

8. Recently this circuit refused to rule on an act of state defense in a suit presenting conflicting claims to oil extracted from the *Persian Gulf. Occ. of Umm al Qaywayn v. A Certain Cargo*, 577 F.2d 1196 (5th Cir. 1978). Because the action required a determination of sovereignty over the well area, the case was dismissed as a non-justiciable political question. In a brief discussion of the source of the act of state doctrine, we noted that the "better view would be that the doctrine·is constitutionally compelled by the concept of separation of powers and placement of plenary foreign relations powers in the executive." 577 F.2d at 1200–01 n. 4.

"proper distribution" depended on several factors, which concerned the ramifications of judicial intervention on executive conduct of international relations or of inconsistent judicial and executive behavior.

The Supreme Court has recently reaffirmed this policy of balancing executive and judicial concerns in *Alfred Dunhill of London v. Republic of Cuba*, 425 U.S. 682, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976). Because the Court "decline[d] to extend the act of state doctrine to acts committed by foreign sovereigns in the course of their purely commercial operations," *Dunhill* has become known as the "commercial exception" to the act of state doctrine. *Dunhill* had mistakenly made an overpayment to Cuba for cigars purchased from expropriated cigar businesses. The Court permitted adjudication of his claim of debt against Cuba:

> [S]ubjecting foreign governments to the rule of law in their commercial dealings presents a much smaller risk of affronting their sovereignty than would an attempt to pass on the legality of their governmental acts. In their commercial capacities, foreign governments do not exercise powers peculiar to sovereigns. . . . Subjecting them in connection with such acts to the same rules of law that apply to private citizens is unlikely to touch very sharply on "national nerves."

425 U.S. at 703–04, 96 S.Ct. at 1866 (footnote omitted). Industrial Investment has urged application of this "commercial exception" to the Indonesian licensing structure. We need not reach the merits of this contention.[9]

Situations have arisen in which the Supreme Court has found the involvement of a foreign state to be too insignificant to invoke the act of state doctrine. For instance, the instigation of foreign governmental involvement does not mechanically protect conduct otherwise illegal in this country from scrutiny by the American courts. In *United States v. Sisal Sales Corp.*, 274 U.S. 268, 47 S.Ct. 592, 71 L.Ed. 1042 (1926), a conspiracy which affected United States commerce was held not to be immune from judicial review of Sherman Act claims even though its success was due in part to procurement of discriminatory foreign legislation. The Court distinguished an earlier antitrust case, *American Banana Co. v. United Fruit Co.*, 213 U.S. 347, 29 S.Ct. 511, 53 L.Ed. 826 (1909), in which the act of state doctrine was held to bar adjudication of claims that defendants had influenced Costa Rica to seize plaintiff's property. *American Banana* also held that the Sherman Act could not be applied against conspiracies occurring outside this country. That latter rule of law has been repudiated. Sherman Act jurisdiction now depends upon a showing of anticompetitive effects within the United States. *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962); *United States v. Sisal Sales Corp., supra*, 274 U.S. 268, 47 S.Ct. 592, 71 L.Ed. 1042; *United States v. Aluminum Co. of America*, 148 F.2d 416 (2d Cir. 1945).

The conspiracy in *American Banana* took place outside the United States and resulted in Costa Rica's seizure of plaintiff's property there. The seizure was valid in costa Rica and the Court held that its validity could not be challenged in American courts. The *Sisal* conspiracy, by comparison, allegedly destroyed plaintiff's sisal exportation business, not by government expropriation, but by the American corporate defendants' takeover aided by foreign legislation. The *Sisal* Court was not interested in the validity of the legislation but was concerned with redressing the anticompetitive effects on American commerce caused by the conspiracy.

---

**9.** A majority of the Court never supported a broad "commercial act" exception to the act of state doctrine. Justice Stevens specifically omitted this part in his concurrence to Justice White's majority opinion, and it was rejected by the four dissenters. However, the Second Circuit, at least in dictum, has treated a commercial exception as firmly established. *Hunt v. Mobil Oil Co.*, 550 F.2d 68 (2d Cir.), *cert. denied*, 434 U.S. 984, 98 S.Ct. 608, 54 L.Ed.2d 477 (1977). *See* Rationalizing the Federal Act of State Doctrine and Evolving Judicial Exceptions, 46 Fordham L.Rev. 295 (1977).

Similarly, a stage fortuitously set by existing foreign legislation cannot automatically be invoked to shield conspiracies to restrain United States trade. In *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962), defendants were charged with conspiring to monopolize the American vanadium industry by currying the favor of a private Canadian corporation designated as exclusive purchasing agent of vanadium by the Canadian government. Drawing from the authority of *Sisal*, the Court rejected the defense that the Canadian law permitted discriminatory purchasing by the authority having power to designate purchasing agents. It was enough that plaintiff claimed that the loss of its business was caused by defendants' actions. The Court was careful to note that the Canadian government itself was not a defendant in the action and that the validity of its legislation was not in issue.

The participation of the Indonesian government in the context of the present analysis cannot prevent Industrial Investment from having its claims adjudicated by the district court. There are no special political factors which outbalance this country's legitimate interest in regulating anticompetitive activity both here and abroad.[10] As in *Sisal* and *Continental Ore*, the complaint charges parties subject to the court's jurisdiction with conduct occurring within this country and elsewhere which violates United States law. To determine whether there has been a violation of American antitrust law it is not necessary to resolve the propriety of Indonesia's failure to issue a cutting license. To protect American antitrust policies, an American court need not embark on an adjudication of the validity of that government's behavior. The Ninth Circuit recently stated:

> The touchstone of *Sabbatino*—the potential for interference with our foreign relations—is the crucial element in determining whether deference should be accorded in any given case. We wish to avoid "passing on the validity" of foreign acts. *Sabbatino*, 376 U.S. at 423, 84 S.Ct. 923. Similarly, we do not wish to challenge the sovereignty of another nation, the wisdom of its policy, or the integrity and motivation of its action. On the other hand, repeating the terms of *Sabbatino, id.* at 428, 84 S.Ct. at 940, "the less important the implications of an issue are for our foreign relations, the weaker the justification for exclusivity in the political branches."

*Timberlane Lumber Co. v. Bank of America*, 549 F.2d 597, 607 (9th Cir. 1976).

The government of Indonesia is not a named co-conspirator here. Its right to withhold a cutting license is not questioned. This is the major factor distinguishing this case from right to ownership cases such as *American Banana* and *Sabbatino*. For instance, in *Occidental Petroleum Corp. v. Buttes Gas & Oil Co.*, 331 F.Supp. 92 (D.C. Cal.1971), *aff'd*, 461 F.2d 1261 (9th Cir. 1972), the plaintiffs, holders of a Middle East oil concession from one of the Trucial States, charged the defendants with inducing an adjacent sheikdom in the Persian Gulf, Sharjah, to grant them a conflicting concession covering the same area. The court invoked the act of state doctrine to avoid having to adjudicate which of the two competing sheikdoms had superior authority to grant the concession. It was found that, to establish their claim as pleaded, plaintiffs had to prove that Sharja's concession was fraudulently issued. Passing upon such foreign governmental acts was considered more appropriate for the executive branch in its handling of foreign relations. By comparison, resolution of the charges made by Industrial Investment does not require a determination of plaintiffs' right

---

**10.** In cases dealing with the enforcement of antitrust laws in the face of state action, we note that the approach of the courts has been to weigh the relative interests of the state and federal governments to determine whether the anticompetitive harm of the activity outweighs the benefits of state regulation. *Bates v. State*

*Bar of Ariz.*, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977); *Cantor v. Detroit Edison Co.*, 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976); *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975); *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943).

to receive a cutting license from the Indonesian government. Unlike *Occidental* where plaintiffs' asserted claim arose through rights granted by a foreign government, Industrial Investment's interest in its business venture with Telaga Mas may be protected from disruptive conduct of competitors by United States antitrust laws.

The only connection which the government of Indonesia has with this action is through application of its Foreign Investment Act, the validity of which is not questioned. The challenge is that a commercial endeavor failed by virtue of external disruptive forces acting on the contractual relationship between private citizens. We need not decide whether, had Telaga Mas not refused to cooperate, the license would have issued as a certainty. It is enough that plaintiffs have offered proof to show that defendants conspired to cause its potential to exploit the Borneo concession to die aborning. *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931); *H & B Equipment Co., Inc. v. International Harvester*, 577 F.2d 239 (5th Cir. 1978); *Heatransfer Corp. v. Volkswagenwerk, A.G.*, 553 F.2d 964 (5th Cir. 1977), *cert. denied*, 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978). Whether the Indonesian government would have issued a cutting license is relevant only to the value of the destroyed joint venture, not to liability for its destruction.

But the Mitsui defendants argue (and the district court agreed) that the damage complained of stems directly from the denial of the government concession to cut timber. In order to establish therefore that defendants' behavior caused the injury, it would be necessary for the court to investigate the Director of Forestry's motivation in cancelling the agreement. This they say amounts to a prohibited inquiry into the validity of governmental activity. However, plaintiffs' complaint does not limit their allegation of injury from the antitrust cause of action to the inability to harvest Indonesian timber. They assert: "The wrongful acts of Defendants and their co-conspirators have deprived it of its contract and concession rights, of its ability to enter and compete in the market, and of the profits it would have derived from such operations." They insist here that even before it was known whether a license would issue, these rights had a substantial value which they could have proven. Plaintiffs are entitled to recover damages for injury to these "business or property" interests if they are caused by antitrust violations. 15 U.S.C.A. § 15. All the injuries contended for may potentially satisfy that description. *North Texas Producers Association v. Young*, 308 F.2d 235 (1962), *cert. denied*, 372 U.S. 929, 83 S.Ct. 874, 9 L.Ed.2d 733 (1963). *See Hunt v. Mobil Oil Corp.*, 410 F.Supp. 10 (S.D.N.Y.1976), *rev'd on other grounds*, 550 F.2d 68 (2d Cir.), *cert. denied*, 434 U.S. 984, 98 S.Ct. 608, 54 L.Ed.2d 477 (1977).

The authority asserted to support Mitsui's position is *Hunt v. Mobil Oil Corp.*, 550 F.2d 68 (2d Cir.), *cert. denied*, 434 U.S. 984, 98 S.Ct. 608, 54 L.Ed.2d 477 (1977), and *Occidental Petroleum Corp. v. Buttes Gas & Oil Co.*, 331 F.Supp. 92 (C.D.Cal.1971), *aff'd*, 461 F.2d 1261 (9th Cir. 1972). Both cases involved expropriation by a foreign state of plaintiffs' properties. This distinction alone is of major significance. The *Hunt* court itself, refusing to apply the precedent of *Sisal*, stated:

> [*Sisal*] considered the assistance of the sovereign through the mechanism of favorable legislation engineered by the defendants to be of considerably less moment than the expropriation by the state of the plaintiff's properties in [*American Banana*].

550 F.2d at 75. Furthermore, separation of powers consideration in *Hunt* strongly counselled against the court's interference.[11] Despite these distinctions, the *Hunt*

---

11. The complaint by Hunt, an independent oil producer holding oil concessions in Libya, charged defendants, the seven major oil companies, with fraudulently inducing Hunt to be uncooperative in pricing negotiations with Libya. Hunt did so, and Libya retaliated by nationalizing Hunt's properties thus totally eliminating Hunt from the field of competition. Lib-

opinion broadly states that in order to prove damages an antitrust plaintiff must show that *but for* the conspiracy the foreign government would not have acted as it did. This, the court continues, requires an inquiry into the motivation of the foreign state and "that inevitably involves its validity." 550 F.2d at 77.

This broad language in *Hunt* has been criticized for encouraging use of the act of state doctrine as a shield by private conspirators who are able to include some foreign governmental act in their anticompetitive scheme.[12] We do not agree that, in establishing a causal relation between the private violations alleged and the injuries suffered, the plaintiffs must prove that defendant's acts were the sole cause of the injury. Of course, plaintiffs must show a causal relationship between defendants' anticompetitive actions and the harm suffered. *Radiant Burners, Inc. v. Peoples Gas*, 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961). However, inquiry beyond the fact of some damage flowing from the unlawful conspiracy relates only to the amount and not the fact of damage. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 114 n. 9, 89 S.Ct. 1562, 1571, 23 L.Ed.2d 129 (1969); *Story Parchment Co. v. Paterson Parchment Paper Co., supra*, 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544; *E & B Equipment Co., Inc. v. International Harvester, supra*, 577 F.2d 239; *Heatransfer v. Volkswagenwerk, A.G., supra*, 553 F.2d 964.

Furthermore, we disagree that motivation and validity are equally protected by the act of state rubric. *See, e. g., Continental Ore Co. v. Union Carbide & Carbon Corp., supra*, 370 U.S. 705, 82 S.Ct. 1404; *Timberlane Lumber Co. v. Bank of America, supra*, 549 F.2d 597. Precluding all inquiry into the motivation behind or circumstances surrounding the sovereign act would uselessly thwart legitimate American goals where adjudication would result in no embarrassment to executive department action. Industrial Investment must only question that government's motivation to the extent of measuring its damage. No ethical standard is set by which the propriety of its decision is tested. Surely the limited nature and effect of determining the proportional cause of plaintiffs' damage allocable to defendants' conduct does not trigger the type of special political considerations protected by the act of state doctrine.

The objective sought by passage of the Sherman Act is preservation and maintenance of effective competition in this country. *United States v. Aluminum Co. of America*, 148 F.2d 416 (2d Cir. 1945). To provide an act of state shield to business entities whose activities happen to reach beyond United States soil would thwart this objective. The courts are an important forum for protection against competitive restraints. Although the act of state doctrine is a vital rule of judicial abstention in the

---

ya was incensed. It loudly proclaimed its purpose to give the United States "a big hard blow in the Arab area on its cold, insolent face." 550 F.2d at 73 *quoting* Statement of the State Department, Hearings before the Subcomm. on Multinational Corporations of the Senate Comm. on Foreign Relations, 93d Cong., 2d Sess., pt. 6, at 316–17 (1974). In response, the United States government wrote the Libyan government and characterized the expropriation as "political reprisal against the United States Government and coercion against the economic interests of certain other U.S. nationals in Libya." 550 F.2d at 73, *quoting*, A. Rovine, Digest of United States Practice in International Law 1973 at 335. The Second Circuit refused to upset the executive's identification of Libya's motivation by another inquiry which "could only be fissiparous, hindering or embarrassing the conduct of foreign relations which is the very reason underlying the policy

of judicial abstention expressed in the doctrine in issue." 550 F.2d at 77–78.

The court found that, even if the Department of State had not openly expressed its position, the political and diplomatic dimensions were too burdensome for resolution by the judiciary: "The action taken here is obviously only an isolated act in a continuing and broadened confrontation between the East and West in an oil crisis which has implications and complications far transcending those suggested by appellants." 550 F.2d 78. No such "implications and complications" hinder a resolution of Industrial Investment's antitrust claims here.

12. Note, Sherman Act Jurisdiction and the Acts of Foreign Sovereigns, 77 Colum.L.Rev. 1247 (1977); Note, the Act of State Doctrine: Anti-Trust Conspiracies to Induce Foreign Sovereign Acts, 10 Int'l Law and Politics 495 (1978).

field of foreign relations, it does not apply in this case.

REVERSED and REMANDED.

JONES, Circuit Judge, dissenting:

The district court's decision as succinctly and accurately stated in the majority opinion, is "that the damage complained of stems directly from the denial of the government concession to cut timber." I am like minded. If the statement be true then the Act of State doctrine requires a dismissal of the action.