**SAGE INTERNATIONAL, LTD.,**
**Plaintiff,**

v.

**CADILLAC GAGE COMPANY,**
**Defendant,**

**and consolidated actions.**

**Civ. A. Nos. 78–70064, 79–44829,**
**80–70493 and 80–71074.**

United States District Court,
E. D. Michigan, S. D.

Aug. 18, 1981.

Jefferson Kirby, Atlanta, Ga., Robert Seymour, Jerome Gropman, Southfield, Mich., for plaintiff.

Roger Timm, Detroit, Mich., Roger Wardle, Farmington Hills, Mich., for defendant.

## OPINION AND ORDER DENYING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT BASED ON THE ACT OF STATE DOCTRINE AND DENYING MOTION TO STRIKE AFFIDAVIT

PATRICIA J. BOYLE, District Judge.

This litigation involves claims by the various Plaintiffs that Defendant interfered with their plans to market an armored car and/or parts for an armored car. Before the Court is Defendant's motion for partial summary judgment dismissing all claims for "market damages." Defendant asserts that proof of market damages cannot be made because Plaintiffs are barred by the Act of State Doctrine from presenting the necessary supporting evidence.

Defendant markets a four-wheeled armored car called the V–150 which it has sold in foreign markets over recent years. The thrust of the Plaintiffs' complaints, relevant to the present motion for partial summary judgment, is that the Defendant unlawfully, in violation of Sections One and Two of the Sherman Act, 15 U.S.C. §§ 1–2, engaged in sham litigation for the purpose of eliminating Plaintiffs from the armored car market [1] and that Defendant conspired with foreign and domestic sales agents to receive illegal kickbacks from these agents. Plaintiffs seek antitrust damages for loss of income occasioned by Defendant's allegedly successful efforts to exclude Plaintiffs from the market.

Defendants have marketed one thousand six hundred twenty-nine (1,629) V–150s in fifteen countries. It is contended by Defendant that the decisions to purchase these armored cars have been made by foreign government personnel or their direct agents and that the Act of State Doctrine bars inquiry into the reasons for the purchases. Defendant then asserts that a causal link sufficient to support a claim of antitrust injury, "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful," *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977), cannot be established in the absence of direct evidence documenting the reason the purchasing nations chose the V–150.[2]

I.

The classic formulation of the Act of State Doctrine is found in *Underhill v. Hernandez,* 168 U.S. 250, 18 S.Ct. 83, 42 L.Ed. 456 (1897), in which the Court said: "Every sovereign State is bound to respect the independence of every other sovereign State, and the courts of one country will not sit in judgment on the acts of the government of another done within its own territory." *Id.* 252, 18 S.Ct. at 84. As the statement suggests, the doctrine emanated from concepts of sovereign immunity and comity. *E.g., Oetjene v. Central Leather Co.,* 246 U.S. 297, 303–04, 38 S.Ct. 309, 311, 62 L.Ed. 726 (1918). Subsequent discussions of the doctrine suggest, however, that the foundations of the doctrine expand beyond those of sovereign immunity. In *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964), a case involving a claim for payment on a sugar contract occasioned by the Cuban government's expropriation of property in violation of inter-

---

1. The Court previously denied Defendant's motion for partial summary judgment brought under the *Noerr-Pennington* doctrine, *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *United Mine Workers of America v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), in an opinion filed February 23, 1981, 507 F.Supp. 939.

2. Plaintiffs dispute the assertion that specific documentation from foreign government agents is essential to causation. Because this is not a proper case for invocation of the Act of State Doctrine, however, it is unnecessary to decide if Plaintiffs could withstand summary judgment were the doctrine applied.

national law, the Court shifted the focus to a separation of powers analysis, observing,

The text of the Constitution does not require the act of state doctrine; it does not irrevocably remove from the judiciary the capacity to review the validity of foreign acts of state.

The act of state doctrine does, however, have "constitutional" underpinnings. It arises out of the basic relationships between branches of government in a system of separation of powers. It concerns the competency of dissimilar institutions to make and implement particular kinds of decisions in the area of international relations. The doctrine as formulated in past decisions expresses the strong sense of the Judicial Branch that its engagement in the task of passing on the validity of foreign acts of state may hinder rather than further this country's pursuit of goals both for itself and for the community of nations as a whole in the international sphere.

*Id.* 423, 84 S.Ct. at 937.

In another case spawned by Cuban expropriation, *First National City Bank v. Banco Nacional de Cuba,* 406 U.S. 759, 92 S.Ct. 1808, 32 L.Ed.2d 466 (1972), Justice Rehnquist, writing for a plurality of the Court, spoke both of the Act of State Doctrine and of sovereign immunity, concluding that they have common origins and "are judicially created to effectuate general notions of comity among nations and among the respective branches of the Federal Government." *Id.* 762, 92 S.Ct. at 1810. Thus, while not returning to a pure sovereign immunity approach, the opinion made clear the interrelation between sovereign immunity and act of state concepts and the ultimate view that comity concerns underlie both doctrines. *Id.* 765, 92 S.Ct. at 1812. Writing for the dissenters (Justices Brennan, Stewart, Marshall, and Blackmun), Justice Brennan criticized the plurality opinion for its inattentiveness to the separation of powers notions embraced in *Sabbati-*

*no* and argued that the proper approach in the case would be abstention on a theory that the issues presented a political question not cognizable in the courts. *Id.* 787–88, 92 S.Ct. at 1822–23; *cf. Baker v. Carr,* 369 U.S. 186, 211–12, 217, 82 S.Ct. 691, 706–07, 710, 7 L.Ed.2d 663 (1962) (discussing political question issues in area of foreign relations and identifying formulations that describe political questions). Four justices, then, expressed their view that the question is one of justiciability. *See generally* Cooper, *Act of State and Sovereign Immunity: A Further Inquiry,* 11 Loy.Chi.L.J. 193, 224–28 (1980). Justice Powell, concurring in the result, contended that *Sabbatino* was unduly broad and that the Act of State Doctrine should be applied on a case-by-case basis using a balancing process to account for the respective judicial and political concerns. *First National City Bank,* 406 U.S. at 774–75, 92 S.Ct. at 1816–17.

As this brief analysis of the positions expressed in *First National City Bank* illustrates, the Court was divided in its perception of the contours of the Act of State Doctrine. What does seem evident is that a majority of the Court was inclined toward a flexible, case-by-case analysis of act of state issues. *See* Note, *The Act of State Doctrine: Antitrust Conspiracies to Induce Foreign Sovereign Acts,* 10 N.Y.U.J. of Int'l L. 495, 504–09 (1978) [hereinafter cited as *"Antitrust Conspiracies"*].

The most recent Supreme Court expression on the Act of State Doctrine appeared in *Alfred Dunhill of London, Inc. v. Republic of Cuba,* 425 U.S. 682, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976), in which the Court declined to invoke the doctrine to bar claims for the purchase price of cigars mistakenly paid to Cuban government agents. In *Dunhill,* the plurality opinion, authored by Justice White, took the position that a "commercial exception" to the Act of State Doctrine should be fashioned. Harking back to a sovereign immunity analysis, the opinion noted that the "restrictive theory"[3] of sov-

---

**3.** The "restrictive theory" exempts commercial activity of sovereigns from the protection of sovereign immunity. *See* Restatement 2d, For-

eign Relations Law of the United States § 69 (1965).

ereign immunity is the prevailing law [4] and concluded, "[T]he mere assertion of sovereignty as a defense to a claim arising out of purely commercial acts by a foreign sovereign is no more effective if given the label 'Act of State' than if it is given the label 'sovereign immunity.'" *Id.* 705, 96 S.Ct. at 1866 (footnote omitted). Responding to the dissenters' contention that sovereign immunity and act of state are distinct concepts, Justice White opined that, in the final analysis, application of each doctrine "involves a balancing of the injury to our foreign policy ... against the injury to the private party, who is denied justice through judicial deference to a raw assertion of sovereignty, and a consequent injury to international trade." *Id.* 705–06 n.18, 96 S.Ct. at 1866–67 n.18. Thus, the concept of balancing interests was again emphasized.[5]

From this summary of Supreme Court precedent addressing the Act of State Doctrine, it is evident that there remains disagreement as to the origins and proper application of the doctrine. However it is understood in theoretical terms, a practical application of the doctrine requires a balancing process which will lead to some variance in results depending on how the subjective factors are weighted.

### A.

Before considering Act of State Doctrine developments in recent lower federal court precedents, some discussion of High Court application of the doctrine in the antitrust field is appropriate. In *American Banana Co. v. United Fruit Co.*, 213 U.S. 347, 29 S.Ct. 511, 53 L.Ed. 826 (1909), the Court applied the Act of State Doctrine to thwart an antitrust claim based on a contention that a foreign sovereign was improperly induced by a private defendant to do acts that restrained trade, reasoning that the sovereign act is necessarily legal because the sovereign itself can so define the act.[6] *Id.* 358, 29 S.Ct. at 513. More recently, in *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962), the Court was confronted with act of state issues in connection with an antitrust claim founded on allegations that plaintiff was excluded from the Canadian market for the sale of vanadium, a product crucial to Canada's defense industry during World War II. Essential to plaintiff's claim was the contention that defendant improperly influenced or controlled Electro Met of Canada, the government-approved import agent for vanadium. In a unanimous decision,[7] the Court rejected an argument that the involvement of the Canadian government shielded the defendant from antitrust liability, stating,

[P]etitioners do not question the validity of any action taken by the Canadian Government or by its Metals Controller.... What the petitioners here contend is that the respondents are liable for actions which they themselves jointly took, as part of their unlawful conspiracy, to influence or to direct the elimination of Continental from the Canadian market. As in *Sisal*, [274 U.S. 268 [, 47 S.Ct. 592, 71 L.Ed. 1042] (1927)] the conspiracy was laid in the United States, was effectuated both here and abroad, and respondents are not insulated by the fact that their conspiracy involved some acts by the agent of a foreign government.

*Id.* 706, 96 S.Ct. at 1867.[8]

---

**4.** In dissent, Justice Marshall correctly noted that the Supreme Court never has given its imprimatur to the "restrictive theory." 425 U.S. at 725, 96 S.Ct. at 1875.

**5.** The dissenters, Justices Brennan, Stewart, Marshall, and Blackmun, again, spoke of the Act of State Doctrine in political question terms, 425 U.S. at 727, 96 S.Ct. at 1877, while Justice Powell, concurring, reiterated his preference for a case-by-case approach, even in situations involving "purely political acts." *Id.* 715, 96 S.Ct. at 1871.

**6.** Another "prong" of the *American Banana* holding, that the Sherman Act does not apply to extraterritorial acts, has been effectively repudiated. *See Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 704, 82 S.Ct. 1404, 1413, 8 L.Ed.2d 777 (1962).

**7.** Justice Frankfurter was not participating.

**8.** *United States v. Sisal Sales Corp.*, 274 U.S. 268, 47 S.Ct. 592, 71 L.Ed. 1042 (1927), referred

Although the Supreme Court has not expressly so stated, the tenor of its decision in *Continental Ore* supports a suggestion, at least, that Act of State Doctrine is less relevant in a situation where antitrust laws have been invoked and where it is contended that an act of state was improperly induced by a non-sovereign defendant for anticompetitive purposes. Elsewhere it has been expressly noted that act of state concerns, especially prevalent in private actions arising from confiscatory conduct by a foreign sovereign, are comparatively reduced where antitrust allegations bring counterbalancing public policy concerns to the fore. *Mannington Mills, Inc. v. Congoleum Corp.*, 595 F.2d 1287, 1293 (3d Cir. 1979).[9] It is proper to conclude, then, that act of state analysis in cases involving antitrust claims will call for consideration of factors distinct from those presented by non-antitrust claims arising from confiscatory or other similar sovereign acts.

### B.

A series of court of appeals decisions decided since *Dunhill* provides a workable

structure within which to analyze current act of state developments. In *Hunt v. Mobil Oil Corp.*, 550 F.2d 68 (2d Cir.), *cert. denied*, 434 U.S. 984, 98 S.Ct. 608, 54 L.Ed.2d 477 (1977), the Second Circuit invoked the Act of State Doctrine and concluded that the antitrust claim in issue on the appeal was non-justiciable. *Id.* 73. Plaintiff in *Hunt* had asserted that it and other oil companies had entered an agreement to counteract severe demands upon the companies by Libya but that, in violation of antitrust laws and the joint agreement, defendants "followed a course of action that led to Hunt's nationalization and elimination from the production of Libyan crude oil." *Id.* 72 n.2. Plaintiff had made "no claim of wrongdoing upon the part of the Libyan government in effecting the expropriation of [its] property ...." *Id.* 80 (Van Graafeiland, J., dissenting).

The Second Circuit dismissed the antitrust claim because, without investigation of the motivation behind the Libyan nationalization action, it would not be possible to show that antitrust injury resulted from the alleged antitrust conspiracy.[10] Finding

to in the quoted passage from *Continental Ore*, read *American Banana* narrowly, concluding that deliberate acts done here and elsewhere that bring about "forbidden results within the United States," 274 U.S. at 276, 47 S.Ct. at 593, are within the jurisdiction of our courts, even though the actors procured and were aided by discriminatory legislation of a foreign sovereign. 370 U.S. at 705–06, 96 S.Ct. at 1866–67. The case is properly understood as one directly addressing only the issue of antitrust jurisdiction, not the Act of State Doctrine. Indirectly, however, the reasoning evidences a deference to antitrust enforcement interests.

Addressing the effect of these, one commentator has observed: "The plain impact of *Sisal Sales* and *Continental Ore* is that the act of state doctrine does not bar judicial review of conspiracies to affect United States commerce when one of the weapons chosen by the conspirators is the act of a foreign state." *Antitrust Conspiracies, supra* at 515.

9. One thoughtful commentary has identified the two major competing interests and summarized certain considerations regarding them in this way:

The first is an interest in the effective enforcement of American antitrust policies,

which not only protect American interests, but also, in part, fulfill the United States' regulatory responsibility to prevent multinational corporations from engaging in economic misconduct damaging to foreign interests. The second interest is the policy of judicial non-interference in the conduct of foreign relations by the executive and legislative branches. When United States courts hear cases involving the activity of a foreign sovereign, there is a risk that the sovereign will be offended. This risk is particularly high when American antitrust laws are involved, since the decision to regulate anticompetitive behavior reflects an ideological preference for a free market economy.

Note, *Sherman Act Jurisdiction and the Acts of Foreign Sovereigns*, 77 Colum.L.Rev. 1247, 1247 (1977) (footnotes omitted) [hereinafter cited as *Sherman Act Jurisdiction*]. *See also* 12 Law & Pol'y Int'l Bus. 503, 518–20 (1980).

10. As expressed by the court, "[A]ntitrust liability cannot be attributed to the defendants unless Hunt can prove that *but for* their combination or conspiracy Libya would not have moved against it." 550 F.2d at 76.

that an examination of motivation necessarily involves the validity of the action, the court concluded that, in deference to the executive branch, such inquiry must be precluded. *Id.* 77–78.

In so ruling, the court rejected a series of arguments from the plaintiff. First, it was contended that the decision should not be governed by *American Banana*, but rather by *Sisal Sales Corp.* and *Continental Ore.* See text at notes 6–8 *supra*.[11] Second, the court rejected plaintiff's claim that it had avoided the reach of the Act of State Doctrine by electing not to name Libya as a defendant and by avoiding any challenge to the propriety of the Libyan action. As already noted, the court found that plaintiff could not so readily circumvent the issue of validity of the Libyan action since proof regarding it was deemed essential to the antitrust cause of action. *Id.* 76–78. Finally, the court rejected the suggestion that the doctrine should apply only where the legality of a foreign sovereign action is challenged. *Id.* 78–79.

The *Hunt* case has been criticized by the Fifth Circuit and by commentators as an unduly broad, inflexible approach to the Act of State Doctrine, with adverse policy consequences for United States antitrust law. *Industrial Investment Development Corp. v. Mitsui & Co.*, 594 F.2d 48, 54–55 & nn.11–12 (5th Cir. 1979), *cert. denied*, 445 U.S. 903, 100 S.Ct. 1078, 63 L.Ed.2d 318 (1980); *Sherman Act Jurisdiction*, *supra* note 9, at 1259–62; *Antitrust Conspiracies*, *supra*, at 519–29; *cf.* Comment, *Sherman Act Litigation: A Modern Generic Approach to Objective Territorial Jurisdiction and the Act of State Doctrine*, 84 Dick.L. Rev. 645 (1980) (advocating balancing of interests to establish flexible approach in keeping with spirit of cases developing line of authority begun in *Timberlane Lumber*

*Co. v. Bank of America*, 549 F.2d 597 (9th Cir. 1976)); 12 Law & Pol'y Int'l Bus. 503 (1980) (same).

In a decision contemporaneous with *Hunt*, the Ninth Circuit considered an act of state defense to antitrust allegations and formulated an analysis significantly different from that of the Second Circuit. *Timberlane Lumber Co. v. Bank of America N. T. & S. A.*, 549 F.2d 597 (9th Cir. 1977), involved a claim by plaintiff that defendant, Bank of America, which had substantial lumber holdings of its own in Honduras, had used Honduran courts to thwart plaintiff's potential to compete in the lumber market. Bank of America was a creditor of a lumber company that had passed into the hands of its creditors. Plaintiff had purchased a substantial interest in the company from certain creditors and sought to obtain the interest still owned by the Bank of America. Allegedly using the Honduran courts and a court appointed officer ("intervenor") who, in fact, was on the payroll of the Bank, efforts were made to disrupt plaintiff's operations to the benefit of defendants' competing lumbering enterprises.

Rejecting defendants' act of state defense, the court first stressed that the doctrine "does not bestow blank-check immunity upon all conduct blessed with some imprimatur of a foreign government," *id.* 606, (citing, *Continental Ore*, 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777), and observed: "Even if the *coup de grace* to Timberlane's enterprise in Honduras was applied by official authorities, we do not agree that the doctrine necessarily shelters these defendants or requires dismissal of the Timberlane action." 549 F.2d at 605. Correct analysis of the act of state defense, in the Ninth Circuit's view, requires a balancing of the policy-related factors presented by the cir-

11. The *Hunt* court said *Sisal Sales* in no way undermined the *American Banana* holding even though in both cases the defendants had been aided by state acts, and in *Sisal* the case was allowed to proceed to adjudication. In part, at least, the conclusion rested on the perception that the action involved in *Sisal* was of "less moment" than the expropriation in *American Banana*. *Id.* 75. No mention is made of the

fact that in *Sisal* the Court had focused on the *effects* of the conspiracy to distinguish *American Banana*. *See Antitrust Conspiracies*, *supra*, at 523.

As for *Continental Ore*, the Second Circuit simply dispensed with the case by observing that "no act of the sovereign was involved in *Continental Ore*." *Id.* 75; *see Antitrust Conspiracies*, *supra*, at 523–24.

cumstances of the particular case. Thus, if there are not important foreign relations implications, there is little justification for the judiciary to avoid involvement in the case.

The *Timberlane* court next noted that the Honduran government had not itself initiated the complained of activity and was not allegedly improperly involved in any fashion. In this connection the court distinguished a circumstance in which a sovereign decree relating to territorial claims is at issue in a private action. Furthermore, there was implicit Honduran policy, reflected by the circumstances of the case, contrary to United States' antitrust interests that would be challenged were the case permitted to proceed. Finally, plaintiffs were complaining of additional actions by defendants that were totally unrelated to the Honduran government. In this regard, the court observed, "These separate activities would clearly be unprotected even if procurement of a Honduran act of state were one part of defendants' overall scheme." *Id.* 608.[12] Thus the court concluded that the Act of State Doctrine would not compel dismissal of the action.

The *Timberlane* decision also discussed act of state related issues when it addressed the question of the extraterritorial reach of antitrust laws. By injecting foreign policy concerns into the traditional jurisdictional analysis of effects of foreign antitrust activity, *see* note 8 *supra; Sisal Sales Corp.,* 274 U.S. 268, 47 S.Ct. 592, 71 L.Ed. 1042, the court more fully implemented its view that a balancing of interests is required to resolve the question of when a court properly may involve itself in adjudicating disputes relating to acts of state. If a complaint alleges sufficient effects, actual or intended, on American foreign commerce together with an adequate indication of an actual antitrust violation, then the court would

consider an additional question before resolving whether there is jurisdiction: "[W]hether the interests of, and links to, the United States—including the magnitude of the effect on American foreign commerce—are sufficiently strong, vis-a-vis those of other nations, to justify an assertion of extraterritorial authority." 549 F.2d at 613. Drawing on Section 40 of the Restatement Second of Foreign Relations and a commentary by Kingman Brewster, the court fashioned the following list of elements to be weighed:

> [T]he degree of conflict with foreign law or policy, the nationality or allegiance of the parties and the locations or principal places of business of corporations, the extent to which enforcement by either state can be expected to achieve compliance, the relative significance of effects on the United States as compared with those elsewhere, the extent to which there is explicit purpose to harm or affect American commerce, the foreseeability of such effect, and the relative importance to the violations charged of conduct within the United States as compared with conduct abroad.

549 F.2d at 614 (footnote omitted) (citing Restatement (Second) of Foreign Relations Law § 40 and K. Brewster, Antitrust and American Business Abroad 446 (1958)).

Cases decided since *Timberlane* and *Hunt* exhibit a preference for the more flexible approach to act of state issues developed in *Timberlane.* In *Industrial Investment Development Corp. v. Mitsui & Co.,* 594 F.2d 48 (5th Cir. 1979), *cert. denied,* 445 U.S. 903, 100 S.Ct. 1078, 63 L.Ed.2d 318 (1980), for example, the court preferred an approach that would account for "legitimate American goals where adjudication would result in no embarrassment to executive department action." *Id.* 55. Despite allegations that defendant, aided by Indonesian regula-

---

12. Using these observations, the court distinguished an earlier case arising in the Ninth Circuit, *Occidental Petroleum Corp. v. Buttes Gas & Oil Co.,* 331 F.Supp. 92 (C.D.Cal.1971), *aff'd per curiam,* 461 F.2d 1261 (9th Cir.), *cert. denied,* 409 U.S. 950, 93 S.Ct. 272, 34 L.Ed.2d 221 (1972). *Occidental Petroleum* may have

been broad enough to resolve the *Timberlane* action and, in fact, was relied on extensively in *Hunt.* 550 F.2d at 75–76. In light of these developments, *Occidental* should be read narrowly with close attention to its particular facts. *See Antitrust Conspiracies, supra,* at 515–17.

tions and officials of that government, succeeded in thwarting plaintiff's attempt to obtain a concession to cut lumber, the court rejected defendants' effort to invoke the act of state defense, concluding,

> Industrial Investment must only question [the Indonesian government's] motivation to the extent of measuring its damage. No ethical standard is set by which the propriety of its decision is tested. Surely the limited nature and effect of determining the proportional cause of plaintiffs' damage allocable to defendants' conduct does not trigger the type of special political considerations protected by the act of state doctrine.

*Id.* In *Industrial Investment*, the preference for a balanced approach to the Act of State Doctrine is, again, clear.[13] In particular, it is noteworthy that the court was concerned that an antitrust plaintiff not be stymied in its efforts to show damages where the elements of liability are otherwise provable without reference to acts of state.

*Mannington Mills, Inc. v. Congoleum Corp.*, 595 F.2d 1287 (3d Cir. 1979), presented act of state issues to the Third Circuit in the context of antitrust litigation stemming from claims that defendant had manipulated foreign patents with anticompetitive purpose and had threatened litigation over the patents in foreign courts. The court stressed the policy concerns attendant to antitrust litigation, noting the "public interest in clearing monopolistic activities from the channels of American commerce," *id.* 1293, and concluded that the acts related to issuance of patents were in substance ministerial, not comparable to acts of expropriation as were in issue in *Hunt v. Mobil Oil.* Having concluded that the doctrine was not applicable, the court proceeded, as had the court in *Timberlane*, to examine the issue of extraterritorial antitrust jurisdiction. Adopting, with slight modifications, the factors enunciated in *Timberlane*, the Third Circuit concluded that the facts in the trial court had not been sufficiently developed to permit an informed balancing[14] and therefore concluded that plaintiff should be permitted to develop a record against which to evaluate jurisdiction. The modifications of the *Timberlane* formulation by the *Mannington Mills* court essentially highlight the foreign relations implications of the exercise of jurisdiction and are summarized in the following identified consideration: "Possible effect upon foreign relations if the court exercises jurisdiction and grants relief." 595 F.2d at 1297.[15]

■ While it is true that the factors identified in *Timberlane* and *Mannington Mills* were formulated in the context of a jurisdictional analysis, their applicability to an Act of State Doctrine evaluation becomes apparent when one recalls the process by which courts generally have determined applicability of the doctrine. As dis-

---

13. "There are no special political factors which outbalance this country's legitimate interest in regulating anticompetitive activity both here and abroad." 594 F.2d at 53 (footnote omitted).

14. In part, the need to await further factual development was required by the fact that some twenty-six nations were involved in the issues being litigated. *Mannington Mills*, 595 F.2d at 1298.

15. As listed by the Third Circuit, the factors are:
 1. Degree of conflict with foreign law or policy;
 2. Nationality of the parties;
 3. Relative importance of the alleged violation of conduct here compared to that abroad;
 4. Availability of a remedy abroad and the pendency of litigation there;
 5. Existence of intent to harm or affect American commerce and its foreseeability;
 6. Possible effect upon foreign relations if the court exercises jurisdiction and grants relief;
 7. If relief is granted, whether a party will be placed in the position of being forced to perform an act illegal in either country or be under conflicting requirements by both countries;
 8. Whether the court can make its order effective;
 9. Whether an order for relief would be acceptable in this country if made by the foreign nation under similar circumstances;
 10. Whether a treaty with the affected nations has addressed the issue.
 595 F.2d at 1297–98.

cussed above in connection with the historical overview of the doctrine, in the last analysis its application depends on a balancing process undertaken in light of the facts of the particular case. *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 428, 84 S.Ct. 923, 940, 11 L.Ed.2d 804 (1964).

■ It has been suggested that application of the Act of State Doctrine can be resolved simply by asking whether the validity of a foreign sovereign act is challenged, *e.g., Hunt v. Mobil Oil Corp.*, 550 F.2d at 80 (Van Graafeiland, J., dissenting), relying on language to that effect in *Sabbatino*, 376 U.S. at 428, 84 S.Ct. at 940, and *Dunhill*, 425 U.S. at 706, 96 S.Ct. at 1867. But the thrust of those Supreme Court precedents is to highlight the broader policy concerns that are not accounted for by engaging in argument over whether validity is in issue when, for example, motivation alone is to be questioned. *See Hunt*, 550 F.2d at 77 (asserting that examination of motivation inevitably involves validity). The more appropriate inquiry goes to general separation of powers and foreign relations concerns. To the extent that these concerns are protected by asking if a direct or implicit judicial attack on the validity of a foreign sovereign act is probable and would be offensive, attention to validity is justified. In such an analysis, the question of validity takes its place among the other considerations being weighed to evaluate the act of state defense in the particular case.[16]

■ A similar approach should be used in analyzing the "commercial exception" to the Act of State Doctrine.[17] The availability of the exception has not been finally resolved with respect to the Act of State Doctrine, but the better reasoned conclusion is that consideration of the commercial nature of a given act is compelled if the doctrine is to be applied correctly. In this connection, attention is owed not to the purpose of the act but to its nature.[18] The goal of the inquiry is to determine if denial of the act of state defense in the case under consideration will thwart the policy concerns in which the doctrine is rooted.

■ In sum, the availability of the act of state defense hinges on policy considerations that are best accounted for by attention to the kinds of factors identified in *Timberlane* and *Mannington Mills*. The tendency to attempt resolution of the question by use of reflexive terms such as "validity" or "commercial" is indicative of the understandable urge to reduce complex issues to simple, mechanical formulations. Yet a candid assessment, for instance, of the "validity" approach reveals that, in deciding what label to attach, the decision-maker has, in fact, given at least tacit consideration to other factors. Those other factors are enumerated in *Timberlane* and *Mannington Mills* in the context of a jurisdictional analysis, but they are similarly pertinent to a fully informed decision on applicability of the Act of State Doctrine, especially where jurisdictional challenges have not been raised, so the court is without a means, other than act of state analysis, to account for the policy factors. Such a formulation assures that a flexible case-by-case approach will evolve, in keeping with *Sabbatino*'s caution that there is no "inflex-

**16.** The following has been said of considerations of validity in the circumstances of an antitrust case:

Antitrust cases raise the issue of the validity of a foreign act of state indirectly, if at all. The court's primary concern is with the motivation behind the sovereign act and not its legality. On the other hand, expropriation cases such as *Sabbatino* touch on the validity of the act of state directly, since the parties' claims will turn precisely on the question of whether the expropriation was legal. In expropriation cases, where the issue of validity is the major point of contention, the danger of insult to the foreign nation is greater, and the potential for embarrassment to the executive branch is correspondingly higher.

*Antitrust Conspiracies, supra*, at 517–18. *But see Hunt v. Mobil Oil Corp.*, 550 F.2d 68 (2d Cir. 1977).

**17.** See text at notes 3–4, *supra*.

**18.** These conclusions are more fully developed in Part I.C., *infra*.

ible and all-encompassing rule." 376 U.S. at 428, 84 S.Ct. at 940.[19]

**C.**

Also pertinent to Act of State Doctrine analysis are legislative developments in the area of sovereign immunity. Following the decision in *Sabbatino*, 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804, Congress amended the Foreign Assistance Act of 1961 to provide, in substance, that the Act of State Doctrine shall not be used by the courts to avoid determining the merits of a claim based on a confiscation in violation of international law unless the President advises that the doctrine should be invoked. 22 U.S.C. § 2370(e)(2), *as amended by* Foreign Assistance Act of 1964, Pub.L.No.88–633, § 301(d), 78 Stat. 1013 ("Hickenlooper Amendment"). Thus the legislature acted promptly to limit the perceived tendency of the Court to act in a manner inconsistent with United States interests when applying the Act of State Doctrine.

Other legislation relevant to act of state considerations is the Foreign Sovereign Immunities Act of 1976 (FSIA). 28 U.S.C. §§ 1602–1611. There Congress adopted the "restrictive theory" of sovereign immunity, *see* notes 3–4, *supra*, providing that no foreign state shall be immune from the jurisdiction of United States courts where the action in the courts is based on commercial activity of the foreign state. 28 U.S.C. § 1605(a)(2); H.R.Rep.No.94–1487, 94th Cong., 2d Sess. 7, *reprinted in* [1976] U.S. Code Cong. & Ad.News 6604, 6605 [hereinafter cited as "House Report"]. The effect of the act is to vest with the judiciary the responsibility to determine whether sovereign immunity shall be available in a given case. *Id.* 6606. Where it is asserted that the defense should be unavailable because the complained of act is commercial, the judicial resolution of the debate is to be made with reference to the nature of the act, not to its purpose. 28 U.S.C. § 1603(d).

In considering the FSIA, Congress was aware of its interplay with the Act of State Doctrine but apparently misperceived the decision in *Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976), as a holding that the Act of State Doctrine does not apply to commercial acts of foreign sovereigns when, in fact, this view was embraced only by a plurality and rejected explicitly by four dissenters. *See Marks v. United States*, 430 U.S. 188, 193, 97 S.Ct. 990, 993, 51 L.Ed.2d 260 (1977).[20] Referring to *Dunhill*, the House Report concludes,

**19.** A similar flexible approach would be undertaken if the political question analysis advocated by the dissenters in *First National City Bank*, 406 U.S. at 787–88, 92 S.Ct. at 1822–23 (Brennan, J., dissenting), were followed. In *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), the Court, speaking of questions touching the field of foreign relations, observed:

> Our cases in this field seem invariably to show a discriminating analysis of the particular question posed, in terms of the history of its management by the political branches, of its susceptibility to judicial handling in the light of its nature and posture in the specific case, and of the possible consequences of judicial action.

*Id.* 211–12, 82 S.Ct. at 706–07. Then, addressing the circumstances in which a political question making a matter nonjusticiable will be found, the Court inquired whether there is a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Id.* 217, 82 S.Ct. at 710.

**20.** The committee is not alone in considering *Dunhill* to have established the commercial exception to the Act of State Doctrine. In *dicta* the Second Circuit discussed *Dunhill's* "majority opinion" as establishing an exception only for "purely commercial act[s]." *Hunt v. Mobil Oil Corp.*, 550 F.2d 68, 72–73 (2d Cir.), *cert. denied*, 434 U.S. 984, 98 S.Ct. 608, 54 L.Ed.2d 477 (1977). *See also Behring International, Inc. v. Imperial Iranian Air Force*, 475 F.Supp. 396, 401 (D.N.J.1979).

The committee has found it unnecessary to address the act of state doctrine in this legislation since decisions such as that in the *Dunhill* case demonstrate that our courts already have considerable guidance enabling them to reject improper assertions of the act of state doctrine. For example, it appears that the doctrine would not apply to the cases covered by H.R. 11315, whose touchstone is a concept of "commercial activity" involving significant jurisdictional contacts with this country.

House Report at 6619 n.1. Perhaps in a quest for a mechanical solution to the complex process of understanding and applying act of state precedents, legislators heralded the plurality opinion in *Dunhill* as proof that the courts could deflect efforts at improper use of the Act of State Doctrine. As the analysis of Supreme Court precedents already has disclosed, the process of understanding and applying the doctrine has not been susceptible to simple rules.

■ It is clear, however, that legislative tampering with the Act of State Doctrine was deferred because of the belief that the doctrine would not be "improperly asserted in an effort to block litigation" after the sovereign immunity defense had been removed. House Report at 6619 n.1. Thus, in viewing act of state issues that are presented on facts to which the FSIA could have application, directly or by analogy, consideration must be given to the legislative preference for a narrowing of act of state and sovereign immunity defenses. To the extent that the doctrine is understood to rest on separation of powers concepts, such deference is mandated to avoid unnecessary weakening of the FSIA.

In the area of antitrust litigation, there is room to question whether, as a general rule, it could be said that every anticompetitive economic conspiracy is "commercial" within the meaning of the act. Were this so, for-

eign sovereigns allegedly involved in conspiracies would themselves be liable under United States antitrust laws, a result that most courts likely would not countenance.[21] There may, however, be certain antitrust situations to which the FSIA would apply. In the legislative history, the Sherman Act is mentioned with the comment that the FSIA is not designed to alter the jurisdictional standards being applied under the Sherman Act. House Report at 6618. Thus, it has been said:

> From the fact that the legislative history takes care to mention the Sherman Act, it could be inferred that Congress contemplated that acts of foreign sovereigns which meet the "effects test" of jurisdiction could be subject to antitrust regulation consistent with the FSIA. This conclusion is also supported by the legislative spirit behind the FSIA and reflects the narrowing trend in sovereign immunity developments.

*Sherman Act Jurisdiction, supra* note 9, at 1254 n.32; *accord, Outboard Marine Corp. v. Pezetel*, 461 F.Supp. 384, 395 (D.Del.1978).

From consideration of legislation and its history, it is apparent that Congress favors a narrow application of the doctrine.[22] This reality merits consideration when evaluating any particular act of state defense, especially because the Supreme Court has yet to speak on the impact of the FSIA on act of state analysis. The clear trend is toward application of a commercial activity exception to the Act of State Doctrine for reasons espoused by the *Dunhill* plurality and to effectuate the legislative intent that the FSIA not be undermined by improper assertion of the act of state defense. *National American Corp. v. Federal Republic of Nigeria*, 448 F.Supp. 622, 640 (S.D.N.Y.1978), aff'd, 597 F.2d 314 (2d Cir. 1979); *see Outboard Marine Corp.*, 461 F.Supp. at 398 n.28. At present, though, the Act of State Doctrine commands a balancing process that

---

**21.** It would seem an undue imposition of free market economy ideals on nations that might well have contrary economic priorities. *See* note 9, *supra.*

**22.** The State Department, an arm of the Executive branch, also has consistently favored restrictive application of the Act of State Doctrine and of foreign sovereign immunity rules. *E.g.*, House Report at 6619 n.1.

**908**

may, in contrast, be avoided in the sovereign immunity context under the mechanical criteria established by the FSIA. In sum, to balance the equation of an act of state case, deference to FSIA intent and purpose must be factored in to reflect the established interests of the legislative and executive branches of our government.

## II.

■ The issue before the Court, then, is whether Defendant can prevail on its act of state defense applying the doctrine in accordance with the precepts just outlined. Commencing with the factors set forth in *Mannington Mills, Inc. v. Congoleum Corp.*, 595 F.2d 1287 (3d Cir. 1979), it is noted, initially, that there appears to be only a limited potential for conflict with foreign policy if this case is adjudicated. Defendant contests this assertion, stressing that foreign military trade is a matter of paramount importance to foreign policy and to Congress, which has legislated controls on arms sales. It is difficult to concede, however, that sales of armored cars, relatively unsophisticated weaponry for the arsenals of this era, have the foreign policy impact claimed by Defendant. It is instructive to note that Congress evidently was prepared to permit entrepreneurs to sue foreign sovereigns on military procurement contracts under the provisions of the FSIA, the legislative history of which clearly includes military purchases within its "commercial exception" to sovereign immunity. House Re-

port at 6615.[23] Moreover, in the instant case, Plaintiffs do not claim that the foreign sovereigns themselves were engaged in wrongdoing by making the purchases. Thus, while it is not suggested that omission of such allegations would automatically exempt a plaintiff from operation of the Act of State Doctrine, it is a relevant consideration here because the absence of a challenge to the foreign sovereign's own decision limits the prospect for interference with foreign relations caused by injured sovereign sensibilities.

This is not a case involving questions of international law such as arise in an expropriation situation. Rather, without impugning the decisions or interests of foreign governments, Plaintiffs at bar might seek to understand the factors behind foreign decisions to purchase a particular armored car so that Plaintiffs can buttress their allegation that Defendant has caused them damage by violation of American antitrust laws. Further, this is not a case in which the foreign sovereign's preference for an economic system different from the free market ideal underlying our antitrust laws would be called into serious question. There is no indication that in even one of the foreign countries to which sales of the V–150 were made the decision process behind the purchase reflects any calculated effort to enhance economic interests contrary to the American free market ideal.[24] Thus, whether concern for foreign policy or law is understood to focus on United States

23. Defendant would interpret the FSIA as limited to simple contract and tort actions and, therefore, as having no effect on the instant case. However, especially in the area of contract disputes, inquiry into the intent and motivation of parties to transactions is common. It is unavailing, therefore, to suggest that asking foreign sovereigns about such matters in the context of the instant case would touch sensitive foreign policy nerves. Similarly, Defendant cannot persuasively assert that allowing the inquiry, were this an FSIA case, would be to elevate purpose of the sovereign act over its nature in violation of that provision of the FSIA which directs attention to the nature of an act in determining if it is commercial within the meaning of the FSIA. 28 U.S.C. § 1603(d). A procurement decision which is commercial for purposes of a contract action stemming from it

is no different where it is subject to scrutiny because a third party suggests that the purchase was influenced by the seller in ways violative of United States antitrust laws. Finally, there is no reason to believe that the FSIA is limited in applicability only to ordinary tort or contract claims. Indeed, the legislative history would suggest otherwise, *see* text following note 21, *supra*, and at least one court has applied the FSIA against a foreign sovereign entity in an antitrust action. *Outboard Marine Corp. v. Pezetel*, 461 F.Supp. 384, 395 (D.Del. 1978).

24. Kickbacks, even if they occurred as alleged, are not the sort of economic activity that would require judicial review of the sovereign's preference for a given economic system.

foreign policy or on the law and policies of the foreign sovereigns, the case at bar does not seriously impinge on either.

■ Also relevant to resolution of the act of state issue is the fact that the parties to this action all are domestic corporations or individuals and that significant portions of the alleged antitrust violation occurred in this country. The sham litigation claims, for example, are purely domestic and involve act of state issues only insofar as proof of damages is found to be dependent on causation proofs related to the foreign purchase decisions. While the teaching of *Hunt v. Mobil Oil Corp.* and its progeny is that act of state concerns cannot be avoided by limiting act of state inquiries to damage questions, the fact remains that *Hunt* is subject to legitimate criticism along lines illuminated earlier in this opinion; considered in perspective, damage-related act of state issues are not as significant as those implicated when the judicial inquiry will more directly evaluate the justification or validity of a foreign act of state. *Industrial Investment Development Corp. v. Mitsui & Co.*, 594 F.2d 48, 54–55 (5th Cir. 1979).

Another consideration is the intent to harm or affect American commerce and its foreseeability. If this evaluation is directed at Defendant, it must be assumed, on this motion for summary judgment brought in an antitrust case, that there was such intent on the part of Defendant. If, on the other hand, the question focuses on the intent of the foreign sovereigns, again it must be concluded at this stage, that there is no indication of any intent negatively to effect our commerce. Requiring Defendant to litigate this case with the concommitant prospect that questions about foreign purchasing decisions may be asked does not apparently subject the foreign sovereign to judicial questioning of fundamental economic policy decisions.

■ For the reasons thus far discussed in connection with foreign law and policy concerns and with issues of economic policy, it cannot be concluded that foreign relations considerations preponderate heavily against adjudication of Plaintiffs' claims in this case. Moreover, if Plaintiffs should prevail, a judgment in their favor could be implemented without any extraterritorial impact since its terms would apply only to the domestic entities that are parties to this action. Therefore, there are no serious long-range foreign relations implications presented by the possibility of a judgment against Defendant. Although sequential reference has not been made to each of the factors identified in *Mannington Mills*, the foregoing discussion reflects attention to the spirit of those considerations and, on balance, supports the conclusion that the act of state doctrine should not preclude pursuit of this litigation by Plaintiffs.

This resolution is buttressed by several additional observations. The litigation involved is founded on antitrust claims and evinces public policy considerations that weigh against its dismissal without resolution of the merits. *See Mannington Mills*, 595 F.2d at 1293; *Industrial Investment Development Corp.*, 594 F.2d at 53. *See also* note 9, *supra*. Furthermore, the scope of the commercial enterprise in issue extends to include sales to fifteen sovereigns, thus making it difficult to resolve on an informed case-by-case basis whether the balance of act of state concerns should bar inquiry into the purchasing decision of any particular one among the group of Defendant's customers.[25] *See* note 14, *supra*. Finally, to the extent that it might be suggested that the foregoing analysis is defective because, according to Defendant, it incorrectly asserts that the gist of Plaintiffs' actions does not include allegations of wrongdoing on the part of foreign sovereigns' agents, it is noteworthy that support exists for the proposition that corrupt activity by foreign sovereigns is beyond the umbrella of the Act of State Doctrine. This

---

**25.** Though the general analysis here adopted would suggest that each of the sales could be investigated in connection with this litigation, the possibility remains that specific considerations as to one or more of the sovereigns might be raised to counter application as to that sovereign of the general ruling embodied in this opinion.

concept rests on the idea that such activity would be violative of the Foreign Corrupt Practices Act of 1977, 15 U.S.C. §§ 78dd–1 to 78dd–2, and on the premise that to shield such activity would be violative of the spirit of the Act. *See Sherman Act Jurisdiction, supra* note 9, at 1261. In *Hunt* the court took care to note that there was no allegation that representatives of Libya, the sovereign there involved, had been seduced or enticed by bribes; they were portrayed as innocent dupes of the domestic conspiracy. 550 F.2d at 79. Noting this language and the view of commentators, a subsequent district court opinion concluded, "[E]ven an unrepudiated act of state may be scrutinized by the courts if it resulted from the corruption of government officials." *Dominicus Americana Bohio v. Gulf & Western Industries, Inc.,* 473 F.Supp. 680, 690 (S.D. N.Y.1979). Because the claims in the instant case properly are viewed as avoiding allegations of direct wrongdoing by the foreign sovereigns themselves, final resolution of whether, if allegations of corruption were made, the Act of State Doctrine could be avoided is not necessary at this time. It is enough simply to observe, on the basis of these comments, that there is a likelihood that the doctrine could be avoided were the allegations such as to call for review of foreign sovereign corruption charges.[26]

Defendant vigorously contests any suggestion that the Act of State Doctrine can be avoided in this case. The arguments forwarded by Defendant are largely answered by the analysis of the doctrine offered thus far in this opinion. In particular, rejection of the broad approach enunciated in *Hunt* significantly weakens Defendant's position. Two recent cases involving armaments are of particular interest and merit discussion both because they parallel, to some extent, the case at bar and because, in each, the Act of State Doctrine was applied.

*General Aircraft Corp. v. Air America, Inc.,* 482 F.Supp. 3 (D.D.C.1979), involved antitrust allegations arising from efforts to market and service an aircraft with short landing and takeoff properties. With respect to lost sales in foreign markets, the court found it had jurisdiction but applied the Act of State Doctrine to avoid litigation of plaintiff's allegations, despite "compelling principles embodied in antitrust legislation." *Id.* 6–7. The analysis of the doctrine was not extensive, and the decision rested substantially on a determination that the claimed injury was directly attributable to the foreign sovereign act and thus was not justiciable. The court did not undertake a significant balancing of competing interests[27] and relied heavily on *Occidental Petroleum Corp.,* a case that should be read narrowly in light of subsequent precedent from the Ninth Circuit.[28]

In *Northrop Corp. v. McDonnell Douglas Corp.,* 498 F.Supp. 1112 (C.D.Cal.1980), another case presenting antitrust allegations related to sale of military aircraft, Plaintiff

---

**26.** Defendant argues that the Foreign Corrupt Practices Act, 15 U.S.C. §§ 78dd–1 to 78dd–2, punishes offers or promises to bribe, thereby avoiding inquiry into whether the bribes were taken or whether they influenced decisions. From this it is asserted that Congress, consistent with the Act of State Doctrine, circumvented any embarrassing inquiry into the foreign sovereign acts. However, since the Act imposes criminal sanctions for bribery "for the purposes of" improper influence or inducement, it is inconceivable that a trial would proceed without some inquiry into whether the alleged improper activity could have had the intended effect, an examination that will call into question the operations of the foreign entity to which the bribe was allegedly directed. The standards of proof in a criminal action, particularly with respect to intent, would seem to require no less. Thus, in spirit and in practice,

the Act supports the notion that act of state concerns are subjugated to interests in stemming foreign corrupt practices.

**27.** One factor that may have influenced the court in *General Aircraft* was the inclusion in the complaint of allegations that the CIA was involved in the conspiracy to effect the procurement decisions of the foreign sovereigns. *Id.* 6. If this factor had been affirmatively considered in an explicit balancing process, as well as it should have been to account for separation of powers concerns, the decision of the court would be more understandable and the case would be plainly distinct from that at bar.

**28.** *See* note 12, *supra.*

alleged that defendant had wrongfully thwarted development and marketing with sales losses resulting in foreign countries. *Id.* 1121. Although the United States was not named in the actions,[29] it was the United States that had full power to designate "the who, what, when and where of weapons system production." *Id.* 1117. The court expressed concern that the injunctive relief sought against defendant would limit the government in its procurement activities related to the fighter aircraft in question. *Id.* 1118. Based on these considerations and the fact that the court understood Northrop to be asking it to decide who "will be the exclusive builder (prime contractor) for the [aircraft] carrier-suitable or land-based versions of the F–18 [fighter plane] weapons system," *id.* 1120, the court concluded the case was nonjusticiable under the political questions doctrine of *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). The district court then gave brief attention to the Act of State Doctrine, noting the *Timberlane* precedent and observing that even if it was otherwise indistinguishable, "the antitrust concerns [in this case] are probably non-existent as an offsetting concern." 498 F.Supp. at 1121.[30]

In *Northrop*, then, the court was primarily concerned with separation of powers issues, though it addressed them in terms of a political question. As has been noted, political questions concerns overlap with act of state issues and properly influence act of state decisions. *First National City Bank*, 406 U.S. at 787–88, 92 S.Ct. at 1822–23 (Brennan, J., dissenting); *see* note 19, *supra*. *See also Antitrust Conspiracies, supra* at 510–13. To a certain extent, the act of state decision in *Northrop* may have rested on unexpressed political questions concerns. More importantly, however, the treatment of the Act of State Doctrine *per se* was fleeting and was capped with an observation that the discussion is simplified because

there are not substantial competing antitrust concerns, a conclusion that cannot similarly be expressed on this motion for summary judgment in the case at bar. Lastly, the footnoted reference to the hallowed place occupied by military arsenals and decisions related to them is made without development and without any acknowledgement of legislation, such as the FSIA, which clearly permits intrusion into that area under proper circumstances. Moreover, no consideration is given to the many different kinds of military hardware marketed in today's world and to the undisputable fact that more sophisticated weaponry, like state-of-the-art fighter plane systems, creates more significant foreign policy concerns attendant to its sale than does conventional weaponry that is marketed with far less governmental interest and supervision. For the reasons explained, then, neither *General Aircraft* nor *Northrop* is controlling on the issues presented by the case *sub judice.*

Accordingly, notwithstanding able arguments to the contrary fashioned by Defendant, it is concluded that the Plaintiff's claims are not barred by the Act of State Doctrine. In this case involving allegations largely related to domestic actions of the Defendant, invocation of the Act of State Doctrine would be to raise a shield made available simply because Defendant has joined foreign sovereign purchasing acts into its alleged antitrust conspiracy against Plaintiffs. It would also represent agreement with Defendant's position that any military procurement decision is beyond the bounds of judicial inquiry, even if the rationale for the decision will not be subject to criticism and the nature of the purchase is not one that raises important separation of powers concerns. This Court can countenance neither result.

Therefore, Defendant's motion for partial summary judgment is DENIED.

---

**29.** In a separate portion of the opinion, the court found it to be an indispensible party that should have been named. *Id.* 1116–19.

**30.** In a footnote, the court suggested this distinction of *Timberlane*: "*Timberlane* (supra) involved a judicial determination of a mortgage dispute. Here we are concerned with one of the most vital concerns of a sovereign—its military arsenal and the decision affecting it." 489 F.Supp. at 1121 n.13.

In light of this conclusion, Plaintiff Verne Corporation's Motion to Strike Affidavit of Windsor E. Ward is DENIED without prejudice to its renewal in the event the affidavit assumes significance in respect to some other aspect of this litigation.

IT IS SO ORDERED.